In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2652

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CALVIN BOENDER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CR 186-1—**Robert M. Dow**, *Judge.*

ARGUED FEBRUARY 11, 2011—DECIDED AUGUST 19, 2011

Before MANION, EVANS[*], and HAMILTON, *Circuit Judges.*

MANION, *Circuit Judge.* Over the course of 2004, Calvin Boender spent approximately $38,000 on home repairs for Isaac Carothers, a Chicago Alderman and crucial player in Boender's attempt to have certain industrial

[*] Circuit Judge Evans died on August 10, 2011, and did not participate in the decision of this case, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

property rezoned for commercial and residential development. Boender also convinced a couple of business associates to donate, at his expense, to Carothers's aunt's congressional campaign. And when the government investigated the earlier events, Boender fabricated an invoice for the home repairs, purportedly sent from his general contractor to Carothers. As a result, Boender was indicted, tried, and convicted of bribing a local official, exceeding federal campaign contribution limits through straw-man donations, and endeavoring to obstruct justice. He appeals aspects of all his convictions. We affirm.

## I. BACKGROUND

### A. *The Galewood Yards Rezoning*

In 2000, Boender purchased a 50-acre parcel in northwest Chicago's Armitage Industrial Corridor. The property, known as Galewood Yards, was zoned for manufacturing use and largely undeveloped. For four years, Union Pacific Railroad leased all, and then part, of the property. Things changed in early 2004 when Union Pacific left. Boender began searching for other uses for the land, and eventually decided to build a full-service retail and residential community. But the City of Chicago's Department of Planning and Development had other plans for the property and, at about the same time, was attempting to designate the entire industrial corridor a Planned Manufacturing District (PMD). This "zoning overlay" would lock in the manufacturing designation for the property, making it very difficult to change the zoning once the PMD was in place.

Local politics being what they are, neither change was likely to succeed without the support of the local alderman. Mindful of this reality, Boender attempted throughout 2004 to cultivate the support of Carothers, the alderman whose ward covered the largest part of Galewood Yards. In March, Boender and his wife each contributed the maximum $2,000 to the congressional campaign of Carothers's aunt, Anita-Rivkin Carothers. Around the same time, he also asked two other associates to contribute to the campaign, promising to reimburse them for the donations. Both contributed $2,000; Boender wrote one of them a check for $4,000 to reimburse him and have him write a check to the other.

In June, Boender hired Stanley Walczak, a general contractor with whom he had previously worked, to paint various parts of Alderman Carothers's house. Boender arranged to pay for the work. When Boender learned of the Department's plan to establish a PMD that included Galewood Yards, he was "irate" and told a Department representative that he did not need to deal with her because "he had made a deal with the alderman." And when the same representative spoke to Carothers about the plan, the alderman responded that "he was going to do what he wanted to do with the land in his ward and [she] was not to discuss it with anybody." Nevertheless, the mayor approved the Department's plan. Early in July, Boender and Carothers met with the Department to discuss the future of Galewood Yards and advocate rezoning the property for residential and retail use, but the Department remained opposed.

While painting Carothers's house in July, Walczak's crew discovered that the windows were rotting. Carothers selected expensive windows, and Boender authorized Walczak to install 31 windows, telling him that Carothers had "helped him a great deal with changing the zoning of Galewood Yards." Boender paid for the windows with a check for $11,252 written from one of his companies. In August, Boender also received an offer from Kerasotes Theatres to purchase 10 acres of Galewood Yards for approximately $4.8 million, contingent on a zoning change to allow for commercial use. That same month, Alderman Carothers gave an interview to the Chicago Sun-Times, at Boender's request, speaking in favor of rezoning Galewood Yards. At about the same time, Carothers asked Walczak to replace several doors and perform some other interior repair work in his house. Boender told Walczak to "Go ahead and do it. The guy is worth it."

In September, Boender filed an application for a zoning change with the City Council. Two weeks later, he paid $12,800 for two air conditioning units for Carothers's home. Shortly after that, Boender authorized Walczak to do additional work necessary to install the units, explaining that the alderman "had helped him a lot with the change of zoning" and "went so far as to stand up to Mayor Daley." In October, Boender paid $13,350 for this work. All told, Boender paid approximately $38,000 for repairs and improvements to Carothers's home.

Although the home repairs were complete in October, the matter of the Galewood Yards zoning was still open.

Unable to proceed with the PMD designation of Galewood Yards without the support of Carothers, the City agreed to a compromise. In 2005, it helped secure an industrial use for half of the property and in exchange agreed to support the rezoning of the other half of the property for commercial and residential use. Carothers sent the Department an official letter of support for the compromise in February 2006 and in March twice advocated rezoning Galewood Yards at City Council hearings. In accordance with the compromise, Carothers supported the ordinance rezoning Galewood Yards, and it passed the City Council on March 29.

B.  *The Fabricated Invoice*

A year later, in August 2007, Boender and Walczak received grand jury subpoenas. They met several times to get their stories straight. After discussing different options, they settled on a story that Walczak had initially billed Carothers but when Carothers failed to pay, Boender felt obliged to pay the bill because he had given Walczak the job. In January 2008, the government issued more grand jury subpoenas to Boender's companies, including those from which the checks for Carothers's home repairs were written. Boender then asked a business partner how much had been spent on the home repairs; when he learned the total amount, Boender stated that he "wish[ed] we had sent an invoice out to the alderman for the work." He then fabricated an invoice for $38,000, dated September 8, 2004, and supposedly from Historic Homes, Ltd., a defunct company he had previously owned.

In late February, Boender gave the fake invoice to his real estate attorney, Michael O'Connor, informing him that the invoice was covered by the subpoena and that he wanted to produce it to the government. O'Connor's only role was to forward Boender's documents to criminal defense attorney Dan Reidy, with whom Boender and O'Connor initially met on February 25. After the initial conversation, Reidy scheduled a meeting with the government to discuss the case and put Boender's best argument forward.

During their initial conversation, Boender had told Reidy that he had sent an invoice to Carothers for work done in 2004. But when Reidy reviewed the invoice in preparation for his meeting with the government, he called Boender and expressed concern that "perhaps the invoice hadn't actually been sent to Mr. Carothers because [he] noticed it was typed and that it was an original." He also told Boender that because Historic Homes was not subject to a subpoena, they did not yet have to produce it. Boender asked whether the document would help him; when Reidy responded that "if it was real, it helped him," Boender assured him that it was in fact real.

At the February 27 meeting, prosecutors told Reidy that the invoice might not be genuine. On February 29, however, the invoice was Bates-stamped and produced with other responsive material. Later that day, Reidy sent an e-mail with Boender's authorization informing the government that the invoice "was not prepared on or about the September 8, 2004 date it bears and was not sent to the named addressee."

C. *Criminal Proceedings*

In 2009, the grand jury indicted Boender on various charges, including: making contributions in excess of federal limitations by soliciting and reimbursing two donors for campaign contributions in violation of the Federal Election Campaign Act, 2 U.S.C. §§ 441a(a)(1), 441f & 437g(d)(1)(A)(ii); corruptly giving things of value to a local official in violation of 18 U.S.C. § 666(a)(2) by paying for Carothers's home repairs; and endeavoring to obstruct justice in violation of 18 U.S.C. § 1503(a) by asking Walczak to give a false story to the government and fabricating and intending to produce a false invoice in support of that story.

In February 2010, the government moved *in limine* to admit testimony and evidence concerning the production of the fabricated invoice, contending that communications about document production are not privileged. It also argued that any privilege that did exist was forfeited under the crime-fraud exception, and asked the district court to conduct, if necessary, an *in camera* hearing to determine whether the exception applied. Boender simultaneously moved to exclude any testimony or evidence related to Reidy because it was protected by the attorney-client privilege. In response, the district court held an *in camera* hearing to resolve the issue. It directed Reidy to appear and ruled that both Boender and the government could attend the hearing. The court heard testimony from Reidy, Reidy's staff, and O'Connor. Finding sufficient evidence that the conversations at issue were "not for the purpose of obtaining legal advice

but for the purpose of perpetrating a crime in connection with the grand jury investigation," and that Boender used his attorneys "as 'front men' in a scheme to subvert the judicial process," the court granted the government's motion to admit the evidence.

Over the course of a six-day trial, the jury heard testimony from numerous witnesses, including Boender's partner and his bookkeeper, from Walczak, from both individuals who made campaign contributions at his direction, from city officials, and from attorneys O'Connor and Reidy. The jury convicted Boender on all counts. After rejecting Boender's post-trial motions for judgment of acquittal and a new trial, the district court sentenced him to a term of 46 months' imprisonment.

## II. LAW & ANALYSIS

On appeal, Boender challenges the district court's denial of his post-trial motions. Specifically, Boender attacks the district court's construction of the statutes underlying his felony conviction under 18 U.S.C. § 666 and his misdemeanor conviction under 2 U.S.C. § 441f. He also challenges his conviction under 18 U.S.C. § 1503 on the grounds that the district court erred in admitting attorney-client privileged communications under the crime-fraud exception. We review *de novo* a district court's ruling on a Federal Rule of Criminal Procedure 29 motion for a judgment of acquittal, but we view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found the essential elements of a crime beyond a reason-

able doubt. *United States v. Doody*, 600 F.3d 752, 754 (7th Cir. 2010). We review a district court's denial of a motion for a new trial under Rule 33 for an abuse of discretion. *United States v. Taylor*, 600 F.3d 863, 869 (7th Cir. 2010). We address each in turn.

A.  *Corrupt Gifts to Alderman Carothers*

First Boender challenges his conviction for violating 18 U.S.C. § 666(a)(2), which criminalizes "corruptly giv[ing] . . . any thing of value" to any state or local government official, "with intent to influence or reward" that official. Boender contends that proving a violation of § 666(a)(2) requires evidence of a specific *quid pro quo*. He maintains that the evidence was insufficient to provide such a *quid pro quo*, and thus that he is entitled to a judgment of acquittal. Failing that, he urges us to remand the case for a new trial because the jury was not instructed that the government needed to prove this element of the crime beyond a reasonable doubt.

The biggest obstacle to Boender's argument is that we long ago held that a specific *quid pro quo* is not an element of § 666(a)(2). *United States v. Agostino*, 132 F.3d 1183, 1190 (7th Cir. 1997). And more recently we held a *quid pro quo* of money is sufficient but not necessary to violate § 666(a)(1)(B), the parallel provision criminalizing the solicitation and acceptance of bribes and rewards. *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005). From these cases, it is clear that our circuit, like most others, does not require a specific *quid pro quo* and that a

jury instruction suggesting such a requirement would be incorrect as a matter of law.

Boender seeks to overcome the obstacle of circuit precedent by drawing a parallel between § 666(a)(2) and the prohibition on bribery of federal officials, 18 U.S.C. § 201(b), which does require proof of a specific *quid pro quo*. *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404 (1999). If this premise were correct and the two statutes parallel, this might indeed be cause for us to revisit *Agostino* (which was decided before *Sun-Diamond*) and *Gee* (which did not discuss the effect of *Sun-Diamond*).

But Boender's premise is false: while parallel in some respects, the two statutes differ in the provisions central to Boender's argument. Whereas § 201(b) makes it a crime to "corruptly give[], offer[] or promise[] anything of value to any public official . . . with intent to influence any official act," § 666(a)(2) criminalizes corrupt giving "with intent to influence *or reward*" a state or local official. Further, § 201(b) is complemented by § 201(c), which trades a broader reach—criminalizing *any* gift given "for or because of any official act performed or to be performed," § 201(c)(1)(A)—for a less severe statutory maximum of two, rather than fifteen, years' imprisonment. Section 666(a)(2) has and needs no such parallel: by its plain text, it already covers both bribes and rewards.

Moreover, Boender's parallel is undermined by *Sun-Diamond* itself. There, the Supreme Court distinguished between bribes, rewards, and other gratuities. The bribery provision, § 201(b), covers only bribery and requires a

specific *quid pro quo*. *Sun-Diamond*, 526 U.S. at 404. The "illegal gratuity" provision, § 201(c), on the other hand, requires only the identification of a specific official act "for or because of which" a gift was given. *Id.* at 406. Tellingly, the example of an illegal gratuity that the Court cited was "a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Id.* at 405. Section § 666(a)(2), however, criminalizes both bribes and rewards in the same section. If the Supreme Court's construction of § 201 in *Sun-Diamond* tells us anything about § 666(a)(2), it is what we said in *Gee*: "A *quid pro quo* of money for a specific legislative act is sufficient to violate [§ 666], but it is not *necessary*." 432 F.3d at 714.

Absent any reasons to reconsider our precedent—and indeed in light of the clear statutory text—we conclude that the government was not required to establish a specific *quid pro quo* of money in exchange for a legislative act. Because they are both premised on his flawed construction of § 666(a)(2), Boender's challenges to the sufficiency of the evidence and the adequacy of the jury instructions necessarily fail.

## B. *Obstruction of Justice*

Boender next challenges his conviction for obstruction of justice under 18 U.S.C. § 1503, claiming that it was based on inadmissible attorney-client privileged communications. Here, he argues that the district court erred

in admitting testimony from his former defense attorney based on the crime-fraud exception to the attorney-client privilege. In light of this error, which he claims infected the entire prosecution, he asks us to remand the case for a new trial. We review a district court's application of the crime-fraud exception for an abuse of discretion. *United States v. BDO Seidman, LLP*, 492 F.3d 806, 818 (7th Cir. 2007).

The crime-fraud exception helps to ensure that the attorney-client privilege does not protect communications made "in furtherance of a crime or fraud." *United States v. Zolin*, 491 U.S. 554, 563 (1986); *BDO Seidman*, 492 F.3d at 818. To establish the crime-fraud exception, and thus defeat the privilege, the government must "present prima facie evidence that gives color to the charge by showing some foundation in fact." *BDO Seidman*, 492 F.3d at 818. Such evidence then allows the district court to require the defendant "to come forward with an explanation for the evidence offered against [the privilege]." *Id.* The district court then exercises its discretion in accepting or rejecting the proffered explanation. The court may, if necessary, examine the privileged communications themselves to determine whether they further a crime or fraud, so long as there is a "showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572.

Boender challenges the procedures the district court followed in deciding that the crime-fraud exception

applies. He argues that there was not enough evidence to justify the district court's decision to hold an *in camera* hearing in the first place. And he attacks the manner in which that hearing was conducted, arguing that the district court should not have allowed the government to attend the hearing.[1]

We begin with the district court's decision to hold an *in camera* hearing to receive testimony related to the crime-fraud exception. Boender's argument on this first point is difficult to follow—he appears to conflate the evidence required to establish a prima facie case supporting the crime-fraud exception with the evidence required to justify *in camera* review. The rule allowing for *in camera* review does not presuppose any particular quantum of evidence establishing the appropriateness of the exception itself, merely enough evidence to support a "good faith belief by a reasonable person" that

---

[1] He also argues that the government should not have been allowed to cross-examine his real estate attorney, Michael O'Connor, without first demonstrating some basis for believing that communications with O'Connor were in further-ance of a crime or fraud. But the only questions asked of O'Connor during the government's very brief cross-examina-tion at the hearing involved the turning over of documents to a third-party and as such were not protected by the attorney-client privilege in the first place. *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983). ("When information is transmitted to an attorney with the intent that the information will be transmitted to a third party . . . , such information is not confi-dential.")

such review may reveal evidence establishing the exception. *Id.* In other words, would *in camera* examination of Boender's defense attorney answer open questions regarding whether the attorney-client communications were made in furtherance of an endeavor to obstruct justice?

The answer to that question is clearly yes. Boender's argument to the contrary ignores a substantial amount of evidence. Specifically, before the hearing the government had evidence that Boender expressed a wish that he had invoiced Carothers back in 2004; that his bookkeeper had not prepared such an invoice; that he had discussed the existence of such an invoice with his defense attorney just before his attorney met with the prosecutor; and that his defense attorney had produced an apparently fake invoice, backdated to September 8, 2004, and sent by a defunct company. The district court had ample reason to believe that the missing pieces to the puzzle—how the document got into the defense attorney's hands in the first place and whether Boender intended the document to be discussed with and produced to the government—could only be found in the testimony of Boender's attorneys. The district court was justified in holding an *in camera* hearing.

Next, we turn to Boender's argument that the district court erred by allowing the government to attend the *in camera* hearing and cross-examine his attorneys. He contends that the Supreme Court at least implicitly condemned this practice when it approved *in camera* review of privileged communications in *Zolin*. In *Zolin*,

the Internal Revenue Service had sought documents and audio tapes that included potentially privileged communications. While it allowed *in camera* review subject to the threshold finding described above, it noted that this placed a considerable burden on a district court that might have to "evaluate large evidentiary records *without* open adversarial guidance of the parties." 491 U.S. at 571 (emphasis added). He argues that we should take the Supreme Court's hint and, by extension, prohibit adversarial proceedings altogether. Further, although he points to no authority establishing that an *in camera* hearing must exclude the government, he argues that the purpose of considering the potentially privileged communications *in camera* is to shield confidential communications from the government as well as the public.

For its part, the government points out that *Zolin* itself did nothing to mandate the exclusion of one or both parties from the *in camera* review of potentially privileged evidence. The government tries to shift the focus from the risks of government intrusion into confidential attorney-client communications to the complications of *ex parte* proceedings. It argues that the Court's unease at giving district courts *carte blanche* for *in camera* review stems, at least in part, from the potential burden that an *ex parte*, non-adversarial setting would place on the courts. And it notes that *ex parte* proceedings are generally disfavored in our adversarial system: they are "the exception rather than the rule." *United States v. Jordan*, 544 F.3d 656, 665 (6th Cir. 2008). According to the government, the use of adversarial proceedings in this and similar situations mitigates, rather than compli-

cates, *Zolin*'s concern with *in camera* review. Ultimately, the government argues, the determination of whether or not the facts warrant an adversarial proceeding to determine whether the crime-fraud exception applies should be left to the district court's discretion.

We find the government's argument persuasive. As an initial matter, we do not read *Zolin* to suggest that adversarial proceedings to determine the existence of the crime-fraud exception are always inappropriate. That case did not involve the live examination of an attorney, merely the *in camera* review of documents containing potentially privileged communications, and thus the Court had no reason to consider whether the presence of the government would be appropriate. When it listed the burden placed on district courts by *in camera* review without the benefit of adversarial guidance, it addressed the situation in that particular case; it did not prescribe a general rule.

Further, flatly disallowing the use of *in camera* adversarial proceedings in crime-fraud exception cases would run counter to the overall approach of *Zolin*, which was to allow greater flexibility for district courts to balance the need to safeguard the privilege with the need to prevent abuse. 491 U.S. at 570-71 (analogizing to the disclosure of military secrets and quoting *United States v. Reynolds*, 345 U.S. 1, 8 (1953)). The standard the Court announced was deliberately flexible. It simply held that the district court must require an adequate factual basis to support a belief that *in camera* review may help establish whether the crime-fraud exception exists. *Id.* at 572.

Similarly in this case, we need not go so far as to hold that a district court may *always* hold adversarial proceedings to help determine whether the crime-fraud exception applies. Some situations may be more or less appropriate for adversarial hearings. Where the disputed communications are contained in documents, for example, the best course may often be review by the judge alone *in camera*. Where the source of the disputed evidence is live testimony, however, it would be most unusual for the judge simply to invite the witness into chambers for a private interrogation session. If a live examination of the potential witness is desired,[2] the choice is between an *ex parte* proceeding or an adversarial proceeding. Although district courts may conduct crime-fraud exception hearings *ex parte* where the circumstances demand it,[3] such proceedings are contrary to the adversarial nature of our judicial system.

---

[2] We do not suggest that direct examination will always be necessary or desirable. It is easy to imagine situations where something in the nature of a set of interrogatories or a detailed proffer from the potential witness might suffice. What is important, however, is that it is within the discretion of the district court how to proceed once it determines that *in camera* review is justified and appropriate.

[3] The government points out that courts allow prosecutors to present evidence, even testimony, *ex parte* where the need for secrecy excludes the subject of the investigation, such as when seeking to apply the exception to permit testimony during a grand jury investigation. *See, e.g.*, *In re Impounded*, 241 F.3d 308, 317-18 n.9 (3d Cir. 2001).

So a presumption against using *ex parte* proceedings should be a factor weighing in favor of adversarial proceedings when they occur.

Another factor that the district court should consider (as it did here) is whether an *ex parte* proceeding would be more or less efficient than an adversarial proceeding. In a case such as this, where the question is whether the government should be allowed to call a former attorney to testify, it may not be practical to determine whether the subjects of potential testimony are privileged without a preview of the government's examination. As the district court here realized, the most sensible manner of proceeding may be to allow the government to question the witness *in camera*. This preserves the claimed privilege and allows the court to decide whether the crime-fraud exception applies to the testimony elicited by the government.

Finally, we note that Boender's primary concern is that the privilege is meant to shield confidential communications from the government as well as the public. Depending on the situation, this concern will vary with each application. If the government were conducting an investigation (as in *Zolin*), Boender might be justifiably concerned with the practical effect of the information the government gathers from *in camera* testimony. Preliminary evidentiary matters, such as this attempt to admit testimony about potentially privileged communications about which the government is already aware, do not present the same risks. The defendant has already been indicted and the only further use

the government intends for the testimony is its presentation before the jury—something that cannot happen if the district court decides the privilege applies.

For these reasons, we hold that the decision of how to structure *in camera* hearings is properly within the discretion of the district court. So long as the government meets its threshold burden justifying an *in camera* hearing, the district court is free to hold adversarial hearings when it determines that the benefit of those hearings outweighs the risk of compromising matters legitimately subject to the attorney-client privilege. And here, the district court did not abuse its discretion in holding an adversarial *in camera* hearing to determine the existence of the crime-fraud exception. As we noted above, there was ample evidence to suggest that an *in camera* hearing would help clarify whether the crime-fraud exception would apply. The district court noted the strength of the evidence the government presented in its detailed proffer, but rather than decide whether the crime-fraud exception applied on the basis of that evidence alone, it ordered an *in camera* hearing. This is not a case of the government fishing for clues amid otherwise privileged information; rather, the purpose was to confirm what was strongly suggested by the evidence, that the crime-fraud exception would apply. Moreover, when Boender's attorney objected to the presence of the government, the judge explained that he did not think an *ex parte* proceeding would be as useful nor that he would be able to resolve the matter without an adversarial hearing. Finally, the risk of misuse of privileged information was virtually nill: there was

already compelling evidence that Reidy's testimony was not privileged, and the court reasonably concluded that sealing the transcript of the hearing and ordering the government not to use anything that is privileged would "obviate any possible prejudice to the defendant."

Finally, for completeness, we note that Boender at times appears to advance a third argument: even after the district court heard Reidy's testimony at the *in camera* hearing, there was insufficient evidence to establish a prima facie case that the initial conversation was in furtherance of a crime.[4] He argues that what occurred at that meeting was at most "anticipatory" obstruction of justice: no decisions were made at that point on whether to turn over the fake invoice, and the discussions of the invoice were purely "hypothetical." Not only is this argument virtually undeveloped, it is a nonstarter. According to Reidy, he and Boender discussed Reidy meeting with the government to present Boender in the most favorable light, as an extortion victim rather than a criminal, and thus improve Boender's

---

[4] Whether Boender is in fact attempting to develop this argument is unclear because his briefs appear to confuse the requirement that non-privileged evidence justifies "a reasonable belief that *in camera* review may yield evidence" to establish the crime-fraud exception's applicability, and the prima facie case the government must make to support the exception. It is not entirely clear whether Boender contends that the testimony at the *in camera* hearing was insufficient to justify the exception, but we construe the briefs broadly for the sake of completeness.

situation with the government. They spent considerable time going over the facts of the case, so that Reidy could put forward the best argument for this position. In this context, Boender told Reidy that Carothers had been sent an invoice for the home repairs. On the morning of the meeting with the government, and after he had reviewed the original invoice, Reidy spoke with Boender and expressed concern over whether the invoice had actually been sent to Carothers. Boender assured Reidy that it had been sent. Boender meant for Reidy to communicate his false story, including the existence of the invoice, to the government. Whether or not Boender actually intended, or agreed, that Reidy produce the invoice itself is irrelevant. The government's proffer gave more than enough "color to the charge" that Boender's communications with Reidy regarding the existence and authenticity of the invoice were in furtherance of his endeavor to obstruct justice by conveying false information to the government and influencing the ongoing grand-jury investigation. *See BDO Seidman*, 492 F.3d at 818.

C. *Campaign Contributions*

Boender's final challenge is to his misdemeanor convictions under 2 U.S.C. § 441f for soliciting and then reimbursing contributions to Anita Rivkin-Carothers's congressional campaign. He argues that § 441f prohibits reimbursement of campaign contributions, but only "false name" contributions, *i.e.*, those in which a person donates directly to a campaign while representing

that the donation is in fact from another person. The government responds that the statute also proscribes what it variably terms "straw man," "reimbursement," or "conduit" contributions, in which one solicits another to deliver funds to a campaign, and either advances or promises to reimburse the expenditure.

The statute at issue provides that "[n]o person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution." 2 U.S.C. § 441f. Boender's argument rests primarily on the premise that the person who delivers the money "makes" the campaign contribution, rather than the person who solicits and reimburses the donation. From this, he argues that the plain language of § 441f applies only when the person who actually delivers the funds from his own account represents that the donation is in fact from another person. Boender adds that courts generally presume that where Congress uses particular language in one section of a statute and omits it in others, it "acts intentionally and purposefully in the disparate inclusion and exclusion," *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002). He compares § 441f to the limit on aggregate contributions to a political candidate during a calendar year in § 441a, stressing that § 441a defines "contribution" (for purposes of that section only) to include "all contributions made by a person, *either directly or indirectly* . . . including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit," while § 441f contains no reference to indirect contributions,

intermediaries, or conduits. Boender argues that this distinction shows that § 441f should be read to exclude indirect or conduit contributions from its scope.

We disagree, and today we join the Ninth Circuit in holding that § 441f unambiguously proscribes straw man, as well as false name, contributions. *See United States v. O'Donnell*, 608 F.3d 546 (9th Cir. 2010). First, Boender's textual argument that only the person who actually transmits funds to a campaign makes the contribution flies in the face of the dictionary and ordinary usage of the word "contribution." *See id.* at 550. To "make a contribution" is of course to "contribute." *See* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 123 (1995) ("Though long neglected in books about writing, buried verbs ought to be a sworn enemy of every serious writer."). And to "contribute" is to "give to a common supply, fund, etc."; ordinarily, when we speak of someone giving a gift, we consider the giver to be the source of the gift, not any intermediary who simply conveys the gift from the donor to the donee. *See O'Donnell*, 608 F.3d at 550.

Second, Boender's textual comparison to § 441a is inapt. He correctly identifies what several circuits have called the *Russello* presumption, that when Congress includes certain language in one provision of a statute but excludes it in another, it generally intends the disparate inclusion and exclusion to be meaningful. *Russello*, 464 U.S. at 23. But while this is a general presumption, it applies with greater strength in some cases than in others: where the disparate provisions were "considered simultaneously when the language raising the implication

was inserted," the Supreme Court has found that the "negative implications raised by disparate provisions are strongest." *Lindh v. Murphy*, 521 U.S. 320, 330 (1997). But the Supreme Court has refused to apply the presumption where the provision including particular language was enacted several years before the less-specific provision. *See Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008). This case presents an even weaker case than *Gomez-Perez* because § 441a, with its specific language, was enacted three years *after* § 441f: we should not presume that the choice of particular language by one Congress should "declare the meaning of an earlier law" enacted by an earlier Congress using different language. *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998); *O'Donnell*, 608 F.3d at 552.

Finally, while we find the meaning of § 441f unambiguous based on the text itself, we note that Boender's interpretation would also undermine the purpose of the statutory scheme of disclosure requirements of which § 441f forms a part by rendering it substantially underinclusive. Straw man contributions undermine the goal of complete and accurate disclosure of the contributors who finance federal elections just as much (if not more) than false name contributions. *See O'Donnell*, 608 F.3d at 554. In short, the text and purpose of § 441f convince us that Congress unambiguously criminalized both straw man and false name contributions.[5]

---

[5] Like the Ninth Circuit in *O'Donnell*, we have no occasion to consider whether § 441f criminalizes the mere reimbursement

(continued...)

### III. Conclusion

None of Boender's challenges to his convictions succeeds. To recapitulate, the interpretations he urges for 18 U.S.C. § 666(a)(2) and 2 U.S.C. § 444f are textually unconvincing and would undermine the purposes of the respective statutes. And the district court did not abuse its discretion in holding an *in camera* hearing on the crime-fraud exception and allowing the government to attend. Therefore, the district court's judgment is AFFIRMED.

---

(...continued)

of campaign contributions, without an prior solicitation. *O'Donnell*, 608 F.3d at 551. Nor do we address Boender's fatally undeveloped argument that the government's interpretation of § 441f violates the First Amendment by criminalizing "encouraging others to make campaign contributions."