In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2117

WILLIAM SHAFFER,

*Plaintiff-Appellant,*

*v.*

AMERICAN MEDICAL ASSOCIATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CV 01656—**Amy J. St. Eve**, *Judge.*

ARGUED NOVEMBER 30, 2010—DECIDED OCTOBER 18, 2011

Before KANNE, WILLIAMS, and TINDER, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* The American Medical Association was not immune to the downturn in the economy. Budget cuts mandated that some employees lose their jobs, including at least one in the department where William Shaffer worked. Fortunately for him, or so it seemed, his supervisor was leaning toward letting another person go. But soon after Shaffer requested leave in light of upcoming surgery, that changed. His

supervisor decided that Shaffer would now be the employee let go in the department, and Shaffer contends that decision was prompted by his request for leave and was therefore improper under the Family and Medical Leave Act. The AMA maintains that the leave request had nothing to do with its decision, and a jury might well agree. But we agree with Shaffer that a reasonable jury could also find in his favor, and we reverse the grant of summary judgment against him.

## I. BACKGROUND

At this stage in the proceedings, we recount the narrative that follows in the light most favorable to Shaffer since he was not the party who moved for summary judgment. The AMA first hired Shaffer in 1999. He resigned a year later, but the AMA rehired him in 2004 as a contract employee, and Michael Lynch hired him as a full-time employee in 2005. By 2008, Shaffer had become AMA's Director of Leadership Communications. His duties in that role included writing speeches and editorials, supervising a staff of three speech writers, and signing off on final speeches.

In August 2008 the economic downturn began to concretely affect the AMA. The organization asked all its departments to reduce their 2009 budgets by at least 3% below the previous year's budgets. At first, Lynch reduced his budget by eliminating an annual conference. The next month, in response to direction from the AMA board, Marietta Parenti, AMA's Chief Marketing Officer,

directed department heads to consider all options to further reduce budgets, including the elimination of positions. Parenti and Lynch ultimately decided they needed to downsize by at least one position in Lynch's department.

On October 28, 2008, Parenti emailed Lynch to ask for his recommendation regarding the elimination of a position. Lynch responded that afternoon, beginning his email by stating, "I know you want closure on this issue tomorrow . . . ." It was already Lynch's plan to eliminate the position of Peter Friedman, the Communications Campaign Manager, because his responsibilities had changed drastically and the AMA had stopped work on one of his core campaigns, and Lynch had previously told Parenti that he had planned to cut Friedman's position. Parenti's October 28 request sought Lynch's recommendation about whether to terminate Shaffer as well, and Lynch wrote in his email that he did not think cutting additional positions beyond Friedman's was in the AMA's best interest and detailed why he thought downsizing the department even more would be a bad idea.

The AMA held its Interim Meeting in early November of 2008. On Thursday, November 20, 2008, Shaffer notified Lynch that he would be having knee replacement surgery on January 12, 2009, that he would be taking four to six weeks of leave as a result, and that he was setting up a claim for short-term disability benefits. The Thanksgiving holiday fell the following week. On the Sunday evening of the holiday weekend, November 30,

Lynch sent Parenti a long email. He explained that he was now of the mind that the AMA should eliminate Shaffer's position and retain Friedman. Lynch also wrote, "The team is already preparing for Bill's short-term leave in January, so his departure should not have any immediate negative impact." He also gave Parenti his "[a]pologies for this 11th hour change of heart."

Lynch and AMA Human Resources Representative Harvey Daniels notified Shaffer on Thursday, December 4, 2008 that the AMA was letting him go. Shaffer's last day on the AMA payroll was January 4, 2009.

On February 2, 2009, after receiving a letter from counsel representing Shaffer, AMA's in-house counsel, Michael Katsuyama, met with Daniels and informed him of possible litigation. On February 3, Daniels typed up handwritten notes he had taken concerning earlier discussions with Lynch about eliminating Shaffer's position. Daniels dated the typed notes November 25, 2008 and shredded his original notes. The typed document states that the position was eliminated because Lynch could accommodate having the speech writing staff report directly to him, a layer of management would be eliminated, and there had been decreased demand on the speech writing staff. Lynch's calendar did not reflect a meeting with Daniels for November 25, though, and Lynch testified in his deposition that he recalled that he was still pondering which position to eliminate over Thanksgiving weekend and had not made a decision as of November 25.

Also during the first few days of February, Daniels told Lynch to prepare a memorandum for Lynch's upcoming

meeting with in-house counsel Katsuyama and to describe in it his rationale for selecting Shaffer as the employee to let go. Lynch typed the memorandum on February 3 or 4, 2009, but he dated it November 21, 2008 and addressed it to Daniels. Lynch gave the memorandum to Katsuyama when they met.

Shaffer filed suit in federal court, and the district court granted summary judgment in the AMA's favor. In May 2009, because of the economic environment, the AMA ended its employment of approximately 100 additional employees, including Friedman.

## II. ANALYSIS

Shaffer appeals the district court's grant of summary judgment against him on his claim that his termination violated the Family and Medical Leave Act. The FMLA guarantees employees twelve workweeks of leave for serious health conditions, including the knee surgery Shaffer had. *See* 29 U.S.C. § 2612(a)(1). The FMLA forbids an employer from interfering with an employee's right to take leave and return to his job and also from retaliating against an employee who claims benefits under the statute. 29 U.S.C. § 2615. We review the district court's grant of summary judgment in favor of the AMA de novo, viewing all facts and drawing all reasonable inferences in the light most favorable to Shaffer, the nonmoving party. *See Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 992 (7th Cir. 2010).

**A. Waiver**

It is not surprising that one of the pieces of evidence on which Shaffer relies is Lynch's November 30 email notifying Parenti that he had decided Shaffer was the employee to be let go. The AMA, however, maintains that we cannot consider this email. In support, it points us to the district court's statement that it was not considering any facts that were not contained in the parties' Rule 56.1 statements. That is certainly within a district court's prerogative to do. *See Cichon v. Exelon Generation Co., L.L.C.,* 401 F.3d 803, 809 (7th Cir. 2005) ("Local Rule 56.1 *requires specifically* that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate 'statement . . . of any additional facts that require the denial of summary judgment.'"); *Metro Life Ins. Co. v. Johnson,* 297 F.3d 558, 562 (7th Cir. 2002) ("[W]e have emphasized the importance of local rules and have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment.") (quotation omitted). But that general statement by the district court in no way supports the AMA's argument that we cannot consider the November 30 email in this case.

The district court's opinion makes clear that the November 30 email was not something it had refused to consider. In fact, it spent an entire five-sentence paragraph in the "Relevant Facts" section of its opinion detailing that very email. The paragraph begins by stating, "On November 30, 2008, the day before Parenti's deadline for making a final decision, Lynch sent an email to Parenti that de-

tailed his '11th hour change of heart' that 'perhaps we should eliminate Bill Shaffer's position and keep Pete's for now . . . .", and it then spelled out much of the rest of the email.

And although the AMA argues that Shaffer failed to include the email in his Rule 56.1 statement, Shaffer discussed the email in paragraph 12 of his Statement of Additional Facts and also stated in that paragraph that a true and accurate copy of the email was attached as Appendix 6, which it was. Shaffer also specifically discussed the email on pages 4 and 5 of his Memorandum in Opposition to the American Medical Association's Motion for Summary Judgment, and pointed to the key passage he relied on, stating, "The email included the justification that 'The team is already preparing for Bill's short-term leave in January, so his departure should not have any immediate negative impact.'" Shaffer further argued on page 10 of his Memorandum that the email did not mention the explanation asserted by the AMA as the reason for the termination decision during litigation, namely that Lynch could easily absorb Shaffer's responsibilities. Shaffer appropriately raised the November 30 email before the district court, the district court discussed it in its opinion, and there is no reason Shaffer cannot point to it on appeal now.

## B. Viable Family and Medical Leave Act Claim

The AMA also argues that Shaffer did not establish one of the prerequisites for FMLA protection, that he worked more than 1,250 hours for the AMA in the previous year.

*See* 29 U.S.C. § 2611(2)(A)(ii). It is true that the parties' Rule 56.1 statements of facts are silent as to this requirement. Yet the AMA admitted in its answer to Shaffer's amended complaint that he had worked there for over 1,250 hours the previous year, so there was no need for Shaffer to raise the matter again.

With that hurdle cleared, we turn to the merits of Shaffer's claim. In doing so, we keep in mind that at the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010) (reversing grant of summary judgment where plaintiff's claims not so implausible that a reasonable jury could not find in his favor).

There are two types of FMLA claims, those for interference and those for retaliation. The FMLA mandates that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA rights. 29 U.S.C. § 2615(a)(1). In addition, the FMLA contains an anti-retaliation provision, making it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). An employer does not, however, violate the FMLA for failing to return him to his former position after he returns from leave if the employee would have been let go even if he had not

taken the leave and the termination decision was unrelated to the leave request. *Goelzer*, 604 F.3d at 993.

"The difference between a retaliation and interference theory is that the first 'requires proof of discriminatory or retaliatory intent while [an interference theory] requires only proof that the employer denied the employee his or her entitlements under the Act.'" *Id.* (citing *Kauffman v. Federal Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005)). The interference and retaliation claims here are closely linked, *see Smith v. HOPE School*, 560 F.3d 694, 701 (7th Cir. 2009), as Shaffer stated in his memorandum in opposition to the AMA's motion for summary judgment; we do not find the interference argument waived. Shaffer was eligible for FMLA protection, covered by the FMLA, and provided sufficient notice of his intent to take leave. *See Goelzer*, 604 F.3d at 993 (summarizing threshold FMLA interference claim requirements). If Shaffer can demonstrate that the AMA fired him to prevent him from exercising his right to reinstatement in his position, he can succeed on an interference theory. *See id.* To succeed on a retaliation theory, under the direct method applicable here, a plaintiff survives summary judgment by "'creating a triable issue of whether the adverse employment action of which she complains had a discriminatory motivation.'" *Lewis v. School Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008) (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 721 (7th Cir. 2005)).

As in *Goelzer*, then, the issue for us to determine in this case is whether a reasonable jury could conclude that

Shaffer's exercise of his right to take FMLA leave was a motivating factor in the decision to eliminate his position. *See Goelzer*, 604 F.3d at 995. The AMA maintains that the decision to terminate Shaffer's employment had nothing to do with his FMLA request. Shaffer thinks otherwise, and contends that a reasonable jury could conclude the AMA terminated his employment because he requested leave protected by the FMLA. We agree with Shaffer that the evidence in the record, when interpreted in the light most favorably to him as we must at this stage, supports that a reasonable jury could find that the AMA chose him as the person in his department to let go because he exercised his right to take FMLA leave.

As of October 28, 2008, Lynch had decided to eliminate Friedman's position and not Shaffer's. Lynch even sent an email to his supervisor detailing why he did not think the elimination of any additional positions beyond Friedman's was in the AMA's best interest. Lynch also said in his deposition that downsizing Friedman's position would be the "obvious choice" to anyone looking at the situation from the outside since the AMA was no longer proceeding with one of Friedman's core campaigns.

Three weeks later, however, Lynch changed his mind. The only events of note in the interim were Shaffer's request for leave on November 20 and the early November AMA Interim Meeting in Orlando. Shaffer sent Lynch an email on Thursday, November 20 informing him that he would be having knee replacement surgery in January and was setting up a claim for short-

term disability benefits. When Lynch emailed Parenti on November 30 that he had now decided to eliminate Shaffer's position and keep Friedman's, he included the comment that "[t]he team is already preparing for Bill [Shaffer]'s short-term leave in January, so his departure should not have any immediate negative impact." A jury could find that this statement, the change in the decision of whom to terminate, and the timing of the new decision soon after Shaffer's leave request support that his request for leave led to his termination.

A jury might also give credence to Shaffer's argument that Daniels backdated a memorandum to make it appear that the decision to let him go was not influenced by the leave request. *See Brunker v. Schwan's Home Serv., Inc.*, 583 F.3d 1004, 1008-09 (7th Cir. 2009) (backdating of termination notice to a date before employee left for treatment to avoid impression that condition influenced termination decision helped create issue for trial); *see also Lewis*, 523 F.3d at 743. On February 3, 2009, Daniels typed up a copy of handwritten notes he said came from an earlier discussion with Lynch regarding Shaffer's termination. Daniels dated the typed notes November 25, 2008, which he said was the same date as his earlier handwritten notes. But Lynch had no recollection of a meeting that day with Daniels, nor did his calendar reflect one.

The AMA emphasizes that November 25 came *after* Shaffer requested leave. At first glance, a memorandum dated after Shaffer requested leave would not seem to support a theory that evidence had been manufactured

to suggest that the leave request did not influence the termination decision. However, viewed in the light most favorable to Shaffer as we must, the record supports a conclusion that when Daniels typed up the notes in February, he was acting under the impression that the leave request had not come until November 26. Daniels stated in his deposition that he had several conversations with Lynch, including one on November 25 and another the next day. Daniels said that Lynch raised Shaffer's request for medical leave for the first time during the November 26 conversation. Daniels also said that Lynch told him during that conversation that he had just learned of the leave request. The troubling fact that Daniels shredded his handwritten notes after learning of potential litigation also could weigh in favor of Shaffer. A jury might conclude from all this that Daniels had been trying to create a paper trail.

A jury could also look to the different explanations given at different times for Shaffer's termination. *See Simple v. Walgreen Co.*, 511 F.3d 668, 671 (7th Cir. 2007) ("The inconsistency is suggestive of pretext and thus is evidence of discrimination . . . ."). The AMA points to the early November Interim Meeting and maintains it helped lead Lynch to change his mind about whom to terminate, as it says Lynch had to fill in for Shaffer to help a junior speech writer when Shaffer was unavailable, and also that Lynch was concerned about the absence without explanation. Yet Lynch told Shaffer that the termination decision had nothing to do with his performance and did not mention any concern about

the Interim Meeting, and Daniels testified in his deposition that he was not told of any problems with Shaffer at the meeting or that Shaffer's performance played any role in the decision to terminate his employment. Daniels's typed-up notes state that the position was eliminated because Lynch could accommodate having the speech writing staff report to him, among other things. In the November 30, 2008 email to Parenti, Lynch justified his change in decision to terminate Shaffer instead of Friedman by stating that Friedman had evolved into a flexible utility man who could fill in the gaps. This email said nothing about the Interim Meeting or Lynch's ability to absorb his responsibilities. And one of the staff speech writers stated in his deposition that Lynch told him Shaffer's position had been eliminated for another reason, that he had the highest salary and largest cost.

Of course, a jury may well agree with the AMA that Shaffer's leave request had no impact on the termination decision. One employee had to be let go in Shaffer's department, and he was certainly one of the candidates. As the AMA argues, a jury might also view the mention in Lynch's email to Parenti that the team was already preparing for Shaffer's upcoming leave not as a reason for terminating him, but as an explanation of its effect. A jury might agree that Shaffer was absent during an important time at the Interim Meeting and that the absence there helped lead the AMA to select his position for elimination. And Daniels testified that he dropped by Lynch's office on November 25, which is a reasonable explanation for why there was no appoint-

ment in Lynch's calendar for that day. He may have then typed up his handwritten notes after he learned of litigation and dated the document the date of his notes, without any intent to have that date help support the termination decision. The competing reasonable inferences that can be drawn from the record are not for us to resolve at the summary judgment stage, however. We are obligated to view the record in the light most favorable to Shaffer and to refrain from weighing the evidence or deciding which inferences to draw from the facts. *See Kodish*, 604 F.3d at 507. Because a reasonable jury could find in Shaffer's favor, we reverse the grant of summary judgment against him.

### C.  Attorney-Client Privilege Protects Memorandum

We now address one more piece of evidence Shaffer would like to use on remand, a memorandum the district court ruled was protected by the attorney-client privilege. The contents of the document did not play into our analysis of whether summary judgment was proper, but so there is no question on remand, we address the privilege question now. The scope of the attorney-client privilege is a question of law we review de novo, while we review the district court's findings of fact and application of law to fact for clear error. *Jenkins v. Bartlett*, 487 F.3d 482, 490 (7th Cir. 2007).

The document in question is a one-page typewritten memorandum from Lynch that on its face is dated November 21, 2008, and entitled "Elimination of staff position." The memorandum is addressed to Harvey

Daniels, but Lynch testified in his deposition that he typed up the memorandum in early February of 2009 for the sole intention of meeting with in-house attorney Katsuyama and that he gave it only to Katsuyama. The document was inadvertently turned over during discovery, and the district court agreed with the AMA's subsequent assertion that the attorney-client privilege protected it.

The attorney-client privilege "'is the oldest of the privileges for confidential communications known to the common law.'" *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2320 (2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). Its purpose is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn*, 449 U.S. at 389. For the attorney-client privilege to attach to the memorandum, we have summarized the requirements to be that the communication contained therein must have been made in confidence, in the connection with the provision of legal services, to an attorney, and in the context of an attorney-client relationship. *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007). The privilege is construed narrowly, and the burden is on the party seeking to invoke the privilege—here, the AMA—to establish that it applies. *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991).

The communication was made in confidence and to an attorney. Lynch created the memorandum for the sole

purpose of meeting with in-house counsel Katsuyama. Lynch created the document alone, did not discuss it with anyone else, and gave the memorandum only to Katsuyama in a meeting where only the two were present. Lynch therefore produced the memorandum in confidence to an attorney.

The next question is whether the communication was made in connection with the provision of legal services. Shaffer argues that Lynch prepared the memorandum only as a matter of standard procedure unrelated to threatened litigation and that it was not in connection with the provision of legal services. However, the evidence in the record shows otherwise. Shaffer's counsel sent a letter to the AMA on January 21, 2009 stating that he intended to file suit for wrongful termination of employment. Katsuyama received it on February 2. Katsuyama then spoke with Daniels, and, as a result, Daniels informed Lynch that Lynch would be meeting with Katsuyama to discuss Shaffer's termination and that he should prepare the document for that meeting. Shaffer points out that Daniels denied telling Lynch that Shaffer was taking legal action. But although Daniels denied making that specific statement, Daniels also testified he was aware that Lynch assumed a lawsuit was pending or threatened. Lynch, the more important person in this inquiry, believed he was providing the memorandum in connection with the provision of legal services. When asked why he drafted the memorandum, he testified that Daniels told him it appeared there would be some litigation regarding the elimination of Shaffer's position, and that in preparation

for the meeting with in-house counsel, he should put in writing his recollection of his decision-making. We agree with the district court that Lynch wrote the memorandum and gave it to Katsuyama in connection with the provision of legal services.

Shaffer also contends that the memorandum was not produced in the context of an attorney-client relationship. Although Human Resources Representative Daniels asked Lynch to create the memorandum and it was addressed to Daniels, Lynch explained that the context of Daniels's request was that "there was going to be some legal action regarding the elimination of Shaffer's position" and that Lynch needed to meet with the AMA's attorney. Lynch also understood that he created the document for the sole purpose of meeting with in-house counsel Katsuyama about the possible lawsuit. The memorandum was therefore prepared in the context of the attorney-client relationship.

Finally, Shaffer argues that even if the attorney-client privilege would normally protect the document, the crime-fraud exception should apply here because, he asserts, it was prepared after the fact to justify the termination. "The crime-fraud exception places communications made in furtherance of a crime or fraud outside the attorney-client privilege." *BDO Seidman*, 492 F.3d at 818. This exception comes from the recognition that when legal advice relates "*not to prior wrongdoing, but to future wrongdoing,*" the privilege goes beyond what is necessary to achieve its purpose. *United States v. Zolin*, 491 U.S. 554, 562-63 (1989) (citation omitted). The excep-

tion's purpose is to ensure that the confidentiality afforded to communications between attorney and client "does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *Id.* at 563 (quoting *O'Rourke v. Darbishire*, [1920] A.C. 581, 604 (P.C.)).

We have said that the party arguing that the crime-fraud exception should apply must first "present prima facie evidence that gives color to the charge by showing some foundation in fact." *United States v. Boender*, 649 F.3d 650, 655 (7th Cir. 2011) (quoting *BDO Seidman*, 492 F.3d at 818). The district court can then require the defendant to come forward with an explanation for the evidence offered against the privilege. *Id.* Finally, the district court exercises its discretion in accepting or rejecting the proffered explanation. *Id.* In this case, after receiving briefs from both sides, the district court conducted an *in camera* review of the document, and, based on the circumstances in this case, ruled that the crime-fraud exception did not apply. We review that decision for an abuse of discretion. *See BDO Seidman*, 492 F.3d at 818.

It is certainly odd that not just Daniels, but also Lynch typed up memoranda after learning of the potential litigation and dated them months before the dates on which they were typed. That said, there is no suggestion from the record that Lynch's memorandum was in furtherance of a crime or fraud. Lynch specifically told in-house counsel that he had prepared the memorandum in preparation for their meeting, and no attempt

was made to hide that fact during the meeting or to anyone else thereafter. The AMA has not attempted to use Lynch's memorandum to support its termination decision, and there is no evidence that in-house counsel assisted Lynch in the commission of a fraud or gave any advice to him regarding the commission of a fraud. *Cf. United States v. Al-Shahin*, 474 F.3d 941, 946-47 (7th Cir. 2007) (applying crime-fraud exception to communications that furthered scheme to collect money from an insurance company for a staged accident). There is no suggestion from the record that Lynch intended to commit a fraud either. Lynch was up front with Katsuyama, the memorandum's intended and only audience, that despite its date he had prepared the memorandum only recently and not in November. Lynch freely acknowledged in his deposition that he drafted the memorandum in February 2009. He also explained that he placed the November 21 date on the memorandum because he had been told to write down his rationale for taking the action he did at the time he did it. Notably, Lynch clearly knew on November 21, the date he placed on the memorandum at issue, that Shaffer had already requested leave since Shaffer had sent him an email requesting it the previous day. The date Lynch placed on his memorandum, unlike the date on the one Daniels typed, therefore does not support a theory that the memorandum was an attempt to rationalize the decision before learning of Shaffer's FMLA leave request. Under these circumstances, the district court did not abuse its discretion when it concluded that the crime-fraud exception did not apply.

We therefore uphold the district court's determination that the attorney-client privilege protects the memorandum.

### III. CONCLUSION

The judgment of the district court is REVERSED, and this case is REMANDED for further proceedings consistent with this opinion.

10-18-11