In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2126

State of Illinois ex rel. Walter E. Ryan
and Bernard McKay,

Plaintiffs-Appellants,

v.

Terry Brown et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 91 C 3725--John A. Nordberg, Judge.

Argued February 16, 2000--Decided September 19, 2000

Before Kanne, Diane P. Wood, and Evans, Circuit
Judges.

Diane P. Wood, Circuit Judge.  Plaintiffs Walter
E. Ryan and Bernard McKay, acting in their
capacity as taxpayers and citizens of the State
of Illinois, brought this suit against Brown
Leasing Company, Terry N. Brown, and other
parties not involved in this appeal, seeking to
recover damages under the Racketeer Influenced
and Corrupt Organization Act, or RICO, 18 U.S.C.
sec.sec. 1962(c) and 1964(c), on behalf of the
State of Illinois. The Brown defendants allegedly
inflicted these damages as part of a complex
bribery scheme that involved the State Treasurer,
Jerome Cosentino, who made large deposits of
state money in non-interest bearing accounts at
the Cosmopolitan Bank of Chicago in exchange for
various benefits. The district court concluded,
upon the Brown defendants' motion for summary
judgment, that the plaintiffs could not show the
necessary two predicate acts to support a claim
under sec. 1962(c), and in the alternative that
the plaintiffs had also failed to produce
sufficient evidence of causation. It therefore
granted summary judgment for the defendants. We
affirm, but on the more fundamental ground that
the plaintiffs did not have standing under RICO
to bring this claim.

I

Plaintiffs contend that the RICO scheme began in 1987 when various officers of Cosmopolitan Bank bribed the then State Treasurer, Cosentino, with commercially unreasonable loans in order to induce him to deposit huge sums of state monies with them. It began by making direct loans to Cosentino and his insolvent trucking company. The bank later allowed Cosentino's companies to engage in massive overdrafts and kiting, shifting money between Cosmopolitan and Drovers Bank. In May 1987, Cosentino reciprocated by beginning to deposit those funds in non-interest bearing accounts at Cosmopolitan. By 1989, the State had deposited some $23 million in both interest bearing and non-interest bearing accounts at the bank. By June of 1989, Cosentino had accumulated overdrafts and other indebtedness to Cosmopolitan equaling about $1.95 million.

Terry Brown, owner of Brown Leasing, was Cosmopolitan's biggest customer. Officers of the bank, including James Wells, Gerald J. DeNicholas, and Alex Vercillo, decided that Brown could help Cosentino out. Accordingly, in June 1989, DeNicholas approached Brown and asked him to make a loan to Cosentino for $1.95 million. He explained that Cosmopolitan itself could not make the loan because it would have violated federal lending limits. Knowing this, Brown nonetheless agreed to the deal. The parties executed a written promissory note that evidenced Brown's loan to Cosentino; the note was secured by a standby letter of guarantee from Cosmopolitan's holding company, as well as by Wells's signature.

Perhaps this was typical of Cosmopolitan's attitude toward federal banking regulations; perhaps not. But in the spring of 1990, federal authorities began investigating the bank for misuse of bank funds by Wells. In the middle of all that, and at Cosmopolitan's request, Brown agreed to restructure the loan to Cosentino and to replace the original promissory note that both Cosentino and Wells had signed. This was done, plaintiffs assert, to try to put some distance between Cosentino and Wells and to prevent the public from learning about the broader scheme between the two. As restructured, the original promissory note was replaced with four promissory notes from Cosentino and three of Wells's associates. The bank's days, however, were numbered: in May 1991, the Comptroller of the Currency closed it down and appointed the FDIC as receiver.

By acting as a conduit for the improper loans to Cosentino, the Brown defendants (according to the plaintiffs) violated quite a number of laws.

Initially, however, it was they who brought suit. Just before Cosmopolitan shut down, Brown realized that he had an uncollectible note for nearly $2 million. He sued the bank in Illinois state court, but when the FDIC took it over, that case was removed to federal court (along with all other pending state court actions against the bank). Brown's suit was dismissed. See Brown Leasing Co. v. FDIC, No. 91 C 3729, 1992 WL 186054 (N.D. Ill. July 28, 1992). In the meantime, the plaintiffs made a demand upon the Illinois Attorney General to pursue all wrongdoers in the scheme; upon his refusal of their demand, they brought a taxpayer suit in state court to recover the State's losses (items such as lost interest and the salaries of the allegedly corrupt officials). The defendants removed their case as well, which is when plaintiffs amended their complaint to add civil RICO charges under sec. 1962(c). Those charges are the only matter now before us; all other claims have been dismissed and have been abandoned on appeal.

II

The original statute under which the plaintiffs filed suit in state court is the Citizens Actions provision of 735 ILCS 5/20-104. That section permits a private citizen to bring an action to recover damages authorized in Article XX of the Illinois Code of Civil Procedure. Article XX in turn deals with "recovery of fraudulently obtained public funds." Central to its application, of course, is the receipt of "compensation, benefits, or remuneration" from the State or from any local government unit. See 735 ILCS 5/20-102 ("refunds"); 5/20-103 ("repayment--civil penalties--lien"). The district court initially concluded that the plaintiffs could not use the Citizens Action provision, 5/20-104, because they had neither alleged that the Brown defendants had received any compensation, benefits, or remuneration from the State, nor had they alleged a violation of the refund section. Later, the court reversed its conclusion that they were not entitled to sue, finding that they had such a right under the Illinois common law public trust doctrine. Ryan v. State of Illinois, No. 91 C 3725, 1995 WL 516603 (N.D. Ill. Aug. 28, 1995). (In this court, they appear to rely on both theories.)

Earlier, while the FDIC was still involved in the litigation, the court had also concluded that the plaintiffs had standing to sue in the name of the State of Illinois under the federal RICO statute. Ryan v. State of Illinois, No. 91 C 3725, 1993 WL 147416 (N.D. Ill. May 3, 1993). The FDIC there had argued that the plaintiffs had

been injured only indirectly, if at all, and thus that their standing was blocked by this court's decision in Carter v. Berger, 777 F.2d 1173 (7th Cir. 1985). The court rejected that, finding that the plaintiffs were entitled to sue if the state itself could have brought such a suit, as a result of the earlier version of section 5/20-104. 1993 WL 147416 at *4. It did not explain why it had concluded that the state citizen suit provision or any other state law doctrine was binding for purposes of the federal statute, and it is entirely possible that no one raised this point with the court.

That question has now been squarely presented to us in this appeal. The Brown defendants argue first, that the question of RICO standing presents an issue of federal law that does not necessarily depend on the way in which a state has allocated its citizen suit powers, and second, that these plaintiffs do not have standing under the governing RICO precedents.

The Supreme Court has held on a number of occasions that we are to evaluate the private enforcement mechanisms provided in RICO in the light of the antitrust statutes on which they were based. See, e.g., Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 489 (1985); Agency Holding Corp. v. Malley-Duff & Assocs., 483 U.S. 143, 150 (1987); Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 267-70 (1992). So we shall do, and the first lesson we take from the antitrust precedents is that the question of standing for RICO purposes is indeed a federal one that must be resolved by reference to federal law. This is precisely the approach we took in Carter v. Berger, supra, although we too did not explain our rationale at that time. District Judge Stanley Roszkowski, in contrast, did write on the subject in O'Donnell v. Kusper, 602 F. Supp. 619 (N.D. Ill. 1985), and we find his reasoning persuasive:

The mere fact that Illinois courts would recognize the plaintiff's standing to bring such an action, however, does not mean that he has standing to bring a federal action arising from the same occurrence. The plaintiff's standing to assert a federally created right is not controlled by state law. As one commentator has noted, "[i]f a challenged state act indeed violates federal law, no reason has yet been found to rest federal standing determinations on the disparate allocations of power that underlie fifty different governmental structures." Wright & Miller, Federal Practice and Procedure, sec. 3531.10 (1984), p. 653.

602 F. Supp. at 622-23 (emphasis in original). We

also draw support for this conclusion from the Supreme Court's holdings in Agency Holding that a federal statute of limitations had to govern RICO actions, see 483 U.S. at 150, and in Holmes, 503 U.S. at 267-68, where the Court used a federal standard for the causation requirements of sec. 1964(c) (the RICO private action provision) and relied heavily on the antitrust standing decision in Associated General Contractors, Inc. v. Carpenters, 459 U.S. 519 (1983).

That clears the way for us to decide whether, as a matter of federal law, a taxpayer derivative suit or citizen suit of this kind is permissible, or if on the other hand a taxpayer's interests are too remote to support RICO standing. In a somewhat different context, we held in Carter that for purposes of sec. 1964(c) "the directly injured party should receive a complete recovery, no matter what; an indirectly injured party should look to the recovery of the directly injured party, not to the wrongdoer, for relief." 777 F.2d at 1176. There, the directly injured party was the county, whose tax collections had been less than they should have been because of the acts of bribery and mail fraud at issue; those plaintiffs claimed that they too were injured because their tax assessments were too high, as a result of the depressed levels of other people's taxes. The plaintiffs' injuries in our case are, if anything, even more remote: they have suffered only in the general way that all taxpayers suffer when the state is victimized by dishonesty. We naturally accept the proposition that the State of Illinois itself was directly injured by the mis-direction of its funds into non-interest bearing accounts and the pockets of miscreants. But that simply suggests that the State is the proper party to be suing, not the plaintiffs.

In response, the plaintiffs argue that they are in exactly the same position they would enjoy if the State had directly assigned them the job of recovering its losses, by virtue of the citizens action law or the public trust doctrine. That would surely be true, if we were talking about a suit under state law, in state court. But we do not see how a state law permitting citizen or taxpayer standing, that requires nothing more in the way of a personal stake on the part of the plaintiff, can override longstanding prudential limitations on the bringing of actions in federal court. General taxpayer actions are not permitted. See Flast v. Cohen, 392 U.S. 83, 104-06 (1968). Antitrust standing is limited in several ways: the plaintiffs must not be too remote from the injury, and so normally only consumers or competitors have standing, not

unions, shareholders, or others further removed; only direct purchasers are entitled to sue; and "antitrust injury" must be present. See Goldwasser v. Ameritech Corp., No. 98-1439, 2000 WL 1022365 at *8 (7th Cir. July 25, 2000) (reviewing various aspects of antitrust standing). If the state law were controlling, then we would have the same lack of uniformity about who was entitled to sue for violations of sec. 1962(c) that the Supreme Court found unacceptable for statute of limitations purposes in Agency Holding.

The State of Illinois is entitled to vindicate its own rights under RICO in federal court. Compare Hawaii v. Standard Oil Co., 405 U.S. 251, 262-64 (1972) (state may not sue under the antitrust laws for generalized harm to its economy, but it may sue for treble damages for injuries it suffers in its proprietary capacity). If the State wishes to reinforce that power with citizens suits, either to expand the resources devoted to catching disloyal actors or to guard against internal corruption, it is certainly free to do so. We hold only that its decisions do not affect the scope of standing for purposes of RICO.

III

This decision is enough to dispose of the case, and so we have no need to reach the district court's other grounds for dismissing the action: the question whether the loan from Brown to Cosentino was a single unified transaction, and thus not a "pattern" of racketeering activity for purposes of sec. 1962(c), and the question whether the plaintiffs presented enough evidence on causation to survive summary judgment. A few comments are nonetheless in order. First, we agree with the district court that the plaintiffs' late effort to save their case by an additional claim that they had shown a violation of RICO sec. 1962(d) (the conspiracy section) was not enough to change the result. Whether or not the pleadings asserted a sec. 1962(d) claim (which would need to be assessed on the substance of the pleadings, not on whether the citation appeared), we see no evidence that the Brown defendants agreed to participate in crimes constituting a pattern of racketeering activity or to join a criminal enterprise. See American Automotive Accessories, Inc. v. Fishman, 175 F.3d 534, 544 (7th Cir. 1999). Second, with respect to causation we note that the Brown defendants allegedly served as a conduit for the loan to Cosentino after the injuries to the State had already occurred. Those injuries, from the State's perspective, included some $3,133 in lost interest, and the deprivation of the honest

services of a state official; the State had no interest otherwise in the monies changing hands among Cosmopolitan, Brown, and Cosentino. If the loan was the alleged racketeering activity, and it did not cause Cosentino to place the state funds in Cosmopolitan's hands, we agree with the district court that plaintiffs would not be able to prove causation in any event. Finally, we have no desire to engage in the scholastic debate over the number of transactions this loan represented: one, two (the loan plus the restructuring), five (the loan plus the four new notes), or something else. We leave such mental exercises to another day and another case where they will determine the outcome.

The judgment of the district court is Affirmed.