In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2028

Robert F. Rifkin, Raymond G.
Scachitti, and Patrick J. Houlihan,

Plaintiffs-Appellants,

Derivatively on behalf of County of
Cook, Nominal Plaintiff, on behalf of
itself and all other municipal and
governmental entities similarly
situated,

Plaintiff-Appellee,

v.

Bear Stearns & Co., Inc., Public
Sector Group, Inc., Seaway
National Bank of Chicago, and
Ernst & Young, L.L.P.,

Defendants-Appellees.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 99 C 3549--Charles R. Norgle, Sr., Judge.


Argued January 25, 2001--Decided April 19,
2001


   Before Coffey, Ripple, and Diane P. Wood,
Circuit Judges.

   Diane P. Wood, Circuit Judge.  In 1992,
Bear Stearns & Co., with the help of the
other defendants in this case,
orchestrated a bond refinancing plan for
Cook County. According to the plaintiffs,
the way the defendants handled the
transaction cheated Cook County and the
United States Treasury out of almost
$250,000. The plaintiffs, citizens of
Cook County who were not purchasers of
the bonds and had no direct involvement
in the refinancing transactions, brought
this suit alleging violations of the
federal Investment Advisers Act of 1940,
15 U.S.C. sec. 80b-1 et seq. ("the

Advisers Act"), the Illinois Recovery of Fraudulently Obtained Public Funds Act, 725 ILCS 5/20-101 et seq. ("Article XX"), and Illinois common law. The district court dismissed the case on the ground that the plaintiffs lacked standing to bring their claims in federal court. We agree, with respect to the Advisers Act claim, and we conclude further that the court did not have even supplemental jurisdiction over the state law claims, as there were no proper federal claims to which the state claims could be appended. We therefore affirm the judgment of the district court.

I

In 1992, interest rates were dropping. Cook County wanted to take advantage of the new lower rates by retiring old municipal bonds it had issued at higher rates and replacing them with new bonds issued at the lower rates. It could not accomplish this goal directly, for the simple reason that the old bonds had not yet matured. Bear Stearns helped the county develop a plan to get around this problem. First, using Bear Stearns as broker, the county issued new bonds, known as "advance refunding bonds," at the new, lower rates. The proceeds from these bonds were used to purchase U.S. Treasury Bonds, which were placed in an escrow account and used to pay off the old bonds as they matured. The interest on advance refunding bonds is generally tax exempt, which makes them attractive to investors. On the other hand, in order to maintain the bonds' tax exempt status, the local government issuing the bonds is not permitted to earn a profit from the escrowed Treasury bonds. If the escrowed bonds generate revenues over the amount needed to pay off the old bonds, the excess must be turned over to the Treasury; if that does not happen, the IRS may declare the interest on the advance refunding bonds taxable.

This feature of the advance refunding bond mechanism gives brokers such as Bear Stearns an opening to engage in a practice known as "yield burning." Because the yield of a Treasury security is inversely related to its price, a broker who wanted to reduce the yield (and thus the potential that excess yields would need to be returned to the Treasury) would mark up the price of the

bonds. Although at first blush one might think that the local government would object to an inflated price, its incentive to do so might be reduced because of the effect of the higher price on the interest generated by the escrowed Treasury bonds: less interest (as long as there is enough to pay the holders of old bonds) means less that the local government has to return to the federal government.

That is what the plaintiffs in this case allege happened to Cook County and its taxpayers. Bear Stearns, they claim, engaged in yield burning when it served as the lead underwriter for the issuance of the 1992 Cook County advance refunding bonds, earning almost $250,000 in improper profits in the process. According to the plaintiffs, the yield burning harmed the county in two ways: first, if Bear Stearns had charged only the market rate for the Treasury bonds and all of the accounting on the escrow account had been done properly, the county would have been entitled to keep approximately $32,000 of the money Bear Stearns appropriated before the escrow accounts began generating profits. Second, the yield burning meant that the county was not paying the appropriate amount to the Treasury, which jeopardized the advance refunding bonds' tax exempt status. (The adverse consequences for federal revenues are, it seems, the principal evil of yield burning; it is unclear to what extent the practice inflicted other harm on the county or the plaintiffs, and given our resolution of the case on standing grounds we make no comment on that point.)

The plaintiffs brought this suit in May 1999, alleging claims under the Advisers Act, Article XX, and various common law theories. In addition to Bear Stearns, the plaintiffs sued Public Sector Group, Inc. (PSG) and Seaway National Bank of Chicago, both of which served as financial advisors to the county with respect to the transaction, and Ernst & Young, which prepared a report verifying the mathematical accuracy of Bear Stearns' calculations with respect to the escrow accounts. The plaintiffs relied on general federal question jurisdiction, 28 U.S.C. sec. 1331, for their Advisers Act claim, and supplemental jurisdiction, 28 U.S.C. sec. 1367, for their state-law claims. They did not, and do not, allege

that the parties are diverse or that any other grounds would support subject matter jurisdiction over the state-law claims.

The district court found that the plaintiffs, whose only connection to the transactions they challenge was as Cook County taxpayers, lacked standing to bring their claims in federal court under both the core standing requirements of Article III of the U.S. Constitution and the prudential standing doctrines. In this appeal, the plaintiffs argue that Illinois's Article XX, which allows taxpayers to sue on behalf of local governments in certain circumstances, is sufficient to confer Article III standing on them, and that where a state statute specifically creates taxpayer standing, prudential standing considerations are irrelevant. We review the district court's decision to dismiss this case for lack of standing de novo. Perry v. Sheahan, 222 F.3d 309, 313 (7th Cir. 2000).

II

This court has recently held, in a case very similar to this one, that standing to bring a federal claim in federal court is exclusively a question of federal law and that a state statute permitting taxpayer standing cannot override federal law. See Illinois ex rel. Ryan v. Brown, 227 F.3d 1042, 1045 (7th Cir. 2000). In Ryan, the plaintiffs sought to bring RICO claims on behalf of the State of Illinois, alleging, as do the plaintiffs here, that Article XX, which (as the formal name suggests) allows citizen suits to recover sums fraudulently obtained from government entities in some situations, see 735 ILCS 5/20-101 to -104, conferred standing on the plaintiffs to sue on behalf of Illinois in federal court. In response to that argument, we stated unequivocally that "[t]he mere fact that Illinois courts would recognize the plaintiff's standing to bring such an action . . . does not mean that he has standing to bring a federal action arising from the same occurrence. The plaintiff's standing to assert a federally-created right is not controlled by state law." 227 F.3d at 1045. Instead, the appropriate question was "whether, as a matter of federal law, a taxpayer derivative suit or citizen suit [on this

kind of claim] is permissible." Id. This holding governs our analysis in the present case. It means that the plaintiffs have standing to pursue their Advisers Act claim in the federal courts only if they can satisfy the requirements of Article III without reference to Illinois's statute.

As the Supreme Court has emphasized, the requirement that a plaintiff have suffered an "injury in fact," defined as "an invasion of a legally protected interest which is . . . concrete and particularized," is an "irreducible constitutional minimum of standing." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). It is axiomatic that being a citizen or taxpayer of an injured governmental body, without more, is not a sufficient injury in fact to create standing for the taxpayer to seek redress of the government's injury. See Lujan, 504 U.S. at 573-74; Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 220 (1974) ("[S]tanding to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share."). As we stated in Ryan, "general taxpayer actions are not permitted" in federal court. 227 F.3d at 1046. Because the plaintiffs here assert only a generalized injury shared by all taxpayers of Cook County, they have not met the irreducible constitutional minimum requirements for standing in federal court.

In an effort to avoid that result, the plaintiffs reiterate an argument that the parties in Ryan asserted unsuccessfully, both in the principal case and in their arguments for rehearing. They urge that their case is no different from the well recognized device of shareholder derivative suits, which are an example of an individual bringing a claim on behalf of a larger entity. There, as here, one entity's claim (that of the corporation) is assigned to the volunteer plaintiff essentially by operation of law, after the efforts by the plaintiff to have the corporation assert its own rights have failed or would have been futile, as long as the plaintiff would be an adequate representative for the corporation. But there is an important difference between

shareholder suits and the kind of taxpayer suit these plaintiffs wish to bring that they have not confronted. As Kamen v. Kemper Financial Servs., Inc., 500 U.S. 90 (1991), pointed out, state law governs the rules for allocating power within a corporation, and it is thus logical to hold that state law governs the circumstances under which a shareholder may be empowered to speak for the corporation in a derivative suit. Id. at 99. When the criteria for a derivative suit are met, the shareholder may bring whatever substantive claim the corporation may have had.

The current taxpayer suit is quite different. Not even the plaintiffs allege that there is a state law that establishes a procedure under which a taxpayer or citizen may displace an Illinois county for all substantive purposes. If there were, then we agree our case would look much more like Kamen, and we would need to decide if the plaintiffs had properly qualified themselves to speak for the county and whether the county had Article III standing to sue. We would also confront the difficult question whether, in light of the Supreme Court's repeated admonitions that taxpayers suits are not permitted in federal court, a suit brought under this hypothetical state statute would be exempt from the standing doctrines that normally bar such suits. But Illinois has not enacted such a statute. Instead, there is a specific statute, Article XX, that makes it unlawful fraudulently to obtain monies from a state governmental unit and that empowers citizens under very specific circumstances to sue to recover that money. Article XX therefore creates both a claim and a remedy, including a limited delegation of authority to citizen-plaintiffs. Nothing in Article XX purports to allow county citizens or taxpayers to speak for the government on claims outside its scope, and we do not have the authority so to expand it.

The plaintiffs' remaining attempts to distinguish their case from Ryan are easily disposed of. First, the plaintiffs suggest that the Ryan opinion dealt only with state common law taxpayer standing, not with a state statute specifically authorizing taxpayer suits. But this represents too narrow a view of the

holding of Ryan. The point there was that state law in general, whether Article XX or common law, was irrelevant to the question whether suit could be brought under a particular federal statute, there RICO. See 227 F.3d at 1044-45. The same analysis applies here. Whether taxpayers can sue to vindicate Cook County's rights under the Advisers Act is a question that must be answered with reference to federal law, both at the level of Article III and prudential standing, and if need be at the statutory level. This argument is therefore without merit.

The plaintiffs' final argument is that the Supreme Court's recent decision in Vermont Agency of Natural Resources v. United States ex rel. Stevens, 120 S. Ct. 1858 (2000), requires a finding of standing here (and, they admit, by parity of reasoning in Ryan). In Vermont Agency, the Court held that a federal qui tam statute in effect creates an assignment of the federal government's claim to the qui tam relator, so that the appropriate analysis of standing in a qui tam case focuses on whether there has been a cognizable injury to the government, not whether there has been a cognizable injury to the relator. 120 S. Ct. at 1863. The plaintiffs argue that the holding in Vermont Agency is equally applicable to state-law qui tam cases. In a sense, they take the position that our analysis of Advisers Act standing is omitting a key step in the process. By operation of Article XX, they claim, Cook County's claims against Bear Stearns and the other defendants were assigned to them. As the legal holders of claims that satisfy all relevant standing criteria for a federal action, they are no longer mere taxpayers, but are the same as Cook County itself. The appropriate question is therefore whether Cook County has suffered a cognizable injury, not whether the qui tam relators have.

This argument, however, simply recasts the basic point we have already rejected. If we were to accept it, states could confer taxpayer standing for any federal claim they wished, simply by allowing taxpayers to claim they were suing on behalf of a governmental entity. Nothing in the Advisers Act indicates that this type of assignment is permissible, unlike the situation in Vermont Agency where the federal statute that provided the basis

of the claim also effected "a partial assignment of the Government's damages claim." 120 S.Ct. at 1863. Were the plaintiffs asserting an independent ground for our subject matter jurisdiction over the Article XX claim, such as diversity jurisdiction, the holding of Vermont Agency might be closer on point. In such a case, however, we would have to confront other difficult questions in this case, such as whether Article XX creates a valid assignment of Cook County's state law claim against the defendants to these relators, whether the extent of the assignment is sufficient to give the relators a "concrete private interest in the outcome of the suit," Vermont Agency, 120 S. Ct. at 1862, and whether Article XX's procedural requirements were met in this case. As the defendants point out, none of these questions is easily answered.

We need not reach them in the case as actually presented, because the plaintiffs have not asserted that we have jurisdiction over their Article XX claim independent of our jurisdiction over their Advisers Act claim. Rather, the only ground for federal jurisdiction over the Article XX claim that plaintiffs have alleged is supplemental jurisdiction under 28 U.S.C. sec. 1367. The district court is empowered to take supplemental jurisdiction over state claims only if the court first has "original jurisdiction" of the claim to which the state claims are attached. See 28 U.S.C. sec. 1367(a). Since we have concluded that the lack of standing over the Advisers Act claim was jurisdictional in nature, the district court also had no subject matter jurisdiction over the Article XX claim.

The plaintiffs seem to want us to treat all three of their claims, in the aggregate, as a "qui tam case." But, as we have already noted, the Advisers Act is not a qui tam statute, and nothing in that statute suggests a congressional intention to allow taxpayer derivative actions under it. The plaintiffs must establish the district court's jurisdiction over each of their claims independently; they are not permitted to use one count of their complaint to establish federal subject matter jurisdiction and a separate count to establish standing. Compare Warth v.

Seldin, 422 U.S. 490, 500 (1975) (standing analysis "often turns on the nature and source of the claim asserted," because "[t]he actual or threatened injury required by Article III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing"). Vermont Agency's discussion of standing in qui tam cases is simply irrelevant to the plaintiffs' standing to bring their Advisers Act claim.

## III

The plaintiffs lack standing to bring their claim under the Investment Advisers Act in federal court. Because they lack standing to bring their federal claim, the district court had no authority to exercise supplemental jurisdiction over their remaining state law claims. In light of these conclusions, we have no occasion to discuss the question whether claims under the Advisers Act are subject to the same one year/ three year statute of limitations that applies to similar securities claims. See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991); Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030 (2d Cir. 1992). Nevertheless, we thank the parties for their supplemental briefs on that issue. The judgment of the district court is Affirmed.