In the

# United States Court of Appeals
### For the Seventh Circuit

---

No. 13-2972

EMPRESS CASINO JOLIET CORP., *et al.*,

*Plaintiffs-Appellants,*

*v.*

JOHN JOHNSTON,
BALMORAL RACING CLUB, INC., and
MAYWOOD PARK TROTTING ASS'N, INC.,

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 3585 — **Matthew F. Kennelly**, *Judge.*

---

ARGUED MARCH 31, 2014 — DECIDED AUGUST 15, 2014

---

Before WOOD, *Chief Judge*, and WILLIAMS and HAMILTON, *Circuit Judges.*

WOOD, *Chief Judge.* Deals are the stuff of legislating. Although logrolling may appear unseemly some of the time, it is not, by itself, illegal. Bribes are. This case requires us once again to decide whether some shenanigans in the Illinois

General Assembly and governor's office crossed the line
from the merely unseemly to the unlawful. It involves a sub-
ject we have visited in the past: two industries that compete
for gambling dollars. See *Empress Casino Joliet Corp. v. Bal-
moral Racing Club, Inc.*, 651 F.3d 722 (7th Cir. 2011) (en banc).
In 2006 and 2008, former Governor Rod Blagojevich signed
into law two bills (to which we refer as the '06 and '08 Acts)
that imposed a tax on certain in-state casinos of 3% of their
revenue and placed the funds into a trust for the benefit of
the horseracing industry. Smelling a rat, the plaintiff casinos
brought suit under the federal Racketeering Influenced and
Corrupt Organizations Act (RICO), 18 U.S.C. § 1964, alleging
that the defendants, all members of the horseracing industry,
had bribed the governor to ensure that the bills were enact-
ed. Viewing the evidence in the light most favorable to the
plaintiffs (and of course not vouching for anything), we con-
clude that there was enough to survive summary judgment
on the claim that the governor agreed to sign the '08 Act in
exchange for a bribe. We therefore reverse in part and re-
mand for further proceedings on that part of the case.

## I

Illinois legalized riverboat casino gambling in 1990. Ever
since, the state's once-thriving horseracing industry has been
in decline. In late 2005 and early 2006, the state General As-
sembly considered legislation to help the horseracers. One
bill would have imposed a 3% tax on casinos earning more
than $50 million annually and deposited the proceeds into a
fund for the benefit of the horseracing industry. It was mod-
eled on similar initiatives in three other states. Lobbying on
all sides was intense. On the first few votes in the General
Assembly, the bill failed to garner a majority.

The bill's fortunes changed later in the spring of 2006. For one thing, it was modified so that the tax applied only to casinos earning more than $200 million annually, thereby limiting its effect to the large casinos in northern Illinois near Chicago. For another, Governor Blagojevich began to take an interest in the matter after his senior aide and alleged pay-to-play facilitator, Christopher Kelly, met with a horseracing executive, John Johnston. On the floor of the General Assembly, the bill's opponents cried foul. "Why are some of you called down to the Governor's office, then you come back up and change your vote?" asked Representative William Black. Added Representative Brent Hassert, "The Governor has weighed in on [the '06 bill] … heavily in the last night or so, calling people and asking people to vote on this. It is my understanding … that there's promises have been made to support this bill." Soon after, the '06 Act cleared the House by a vote of 70-32; a week later, the Senate passed it 40-16. Governor Blagojevich signed the bill into law the next day. Johnston and other racing executives thanked the governor for his support of the bill in a personal letter. Using various subsidiaries, they then contributed $125,000 to his campaign fund.

The '06 Act contained a two-year sunset provision. In early 2008, the General Assembly began to consider its renewal. Meanwhile, horseracing executive Johnston met with Governor Blagojevich and his chief of staff Alonzo Monk. Blagojevich gave no indication whether he would support the renewed bill, telling Johnston, "Appreciate your support in the past, hope you can continue to support me in the future." In the fall, with the bill stalled in the General Assembly, Blagojevich called Johnston to solicit campaign donations. Johnston pledged to give $100,000, but he did not send the mon-

ey. Over the next few months, Monk repeatedly needled Johnston about following through on the pledge. In one conversation recorded by federal authorities, Johnston told Monk: "Look, tell the big guy [Blagojevich] I'm good for it. … I'm just figuring out which accounts to pull the checks from."

In November, the General Assembly voted to renew the Racing Act by a vote of 83-28; the Senate likewise did so by a vote of 37-13. Representative Robert Molaro, a sponsor of the original Racing Act legislation, testified later that Governor Blagojevich played no role in the passage of the '08 Act. But in contrast to his immediate signing of the '06 Act, the governor initially did nothing with the '08 Act. Johnston complained to Monk in a recorded conversation that the governor's delay in signing the bill was costing him $9,000 per day. "This is getting goofier," Johnston told a colleague in an email, "We are going to have to put a stronger bit in his mouth!?!" In another recorded conversation, Monk told the governor that Johnston was breathing down his neck about the bill. The governor replied that the bill would be signed, but it was a "timing issue." Possibly alluding to Johnston's $100,000 commitment, the governor explained that he would "like some separation between that and signing the bill."

By December, Johnston still had not ponied up the $100,000 and Governor Blagojevich still had not signed the '08 Act into law. In recorded conversations, the governor and Monk strategized about "how [Monk] [could] approach John Johnston to get the donation of one hundred thousand dollars." Monk made clear that Johnston was desperate to have the Racing Act renewal signed into law. He told the governor: "Look, I want to go to [Johnston] without crossing the

line and say, give us the fuckin' money … give us the money and one has nothing to do with the other. … But give us the fuckin' money, because they're losing 9,000 a day … for every day it's not signed." Monk then met with Johnston to deliver a message, as he later recalled it, that "once [Johnston] made the contribution, the act would be signed." Johnston asked Monk: "Do you want me to make some of the payment now and some of the payment after the beginning of the year?" Asked whether Johnston ever directly promised to deliver the money, Monk later testified: "I think he did to me." After the meeting, Monk called the governor to report that Johnston would soon pay up.

A few days later, federal authorities arrested Blagojevich. Despite the arrest, Blagojevich later signed the '08 Act into law. The charging documents against Blagojevich alleged that the governor had linked signage of the '08 Act to a commitment to donate $100,000 in discussions with an unnamed representative of the horseracing industry. Regarding that charge, Johnston admitted, "I didn't know if anybody else had given $100,000, but I knew I did." (Despite this statement, Johnston never actually delivered the money.) Johnston signed an immunity agreement which represented that he "may have information relevant to the [Blagojevich] investigation" and acknowledged "that such information may tend to incriminate [himself]." Later, an investigative report by the General Assembly found that Blagojevich traded state action for campaign contributions, including from "Race Horse Executive 1," later revealed to be Johnston, in exchange for enactment of the '08 Act.

The appellants here are Empress Casino Joliet Corporation, Des Plaines Development Limited Partnership, Holly-

wood Casino-Aurora, Inc., and Elgin Riverboat Resort-Riverboat Casino (the Casinos). They are all Illinois casinos taxed under the '06 and '08 Acts. Their first move was to challenge the validity of the Acts in state court. The Illinois Supreme Court rejected their challenge to the '06 Act under the state and federal constitutions. *Empress Casino Joliet Corp. v. Giannoulias*, 896 N.E.2d 277 (Ill. 2008), *cert. denied* 556 U.S. 1281 (2009) (*Empress I*). Illinois courts later rejected a similar challenge to the '08 Act. *Empress Casino Joliet Corp. v. Giannoulias*, 942 N.E.2d 783 (Ill. App. Ct. 2011), *app. denied* 949 N.E.2d 1097 (Ill. 2011) (*Empress II*). The appellees here—horseracing tracks and executives that benefitted from the '06 and '08 Acts (the Racetracks)—intervened and participated in both state actions.

The Casinos then filed a federal RICO suit against the Racetracks and former Governor Blagojevich seeking damages and a constructive trust over the tax money received by the Racetracks under the '06 and '08 Acts. A panel of this court held that legislative immunity barred the suit against Blagojevich but that the Tax Injunction Act permitted the constructive trust. *Empress Casino Joliet Corp. v. Blagojevich*, 638 F.3d 519 (7th Cir. 2011) (*Empress III*). Sitting *en banc*, we rejected the position that the panel had taken with regard to the Tax Injunction Act. *Empress Casino Joliet Corp. v. Balmoral Racing Club*, 651 F.3d at 726 (*Empress IV*). On remand, the district court granted summary judgment for the Racetracks on the Casinos' claims of a conspiracy to exchange campaign contributions for state action in violation of RICO, 18 U.S.C. § 1962(d). The district court found that the Casinos had offered evidence from which a reasonable jury could find that there was a pattern of racketeering activity. It also found that a jury could find that an enterprise-in-fact, consisting of

Governor Blagojevich, his associates, and various other participants, existed. The court concluded that there was sufficient evidence to support a jury finding that the defendants bribed Blagojevich to secure his signature on the '08 Act, but assumed, without deciding, the sufficiency of the evidence relating to the '06 Act. The court went on to determine that the Casinos could not show that the alleged bribes proximately caused their injury. The only element on which the Casinos lost was therefore proximate cause. The Casinos appealed to this court.

## II

We begin with the Racetracks' argument that the results of the two prior state actions foreclose the Casinos' claims under the claim preclusion branch of *res judicata*. We apply the same preclusive effect to a state court judgment as the state court itself would apply. 28 U.S.C. § 1738; see *Marrese v. Amer. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985).

Under Illinois law, "[f]or the doctrine of *res judicata* to apply, the following three requirements must be satisfied: (1) there was a final judgment on the merits rendered by a court of competent jurisdiction; (2) there is an identity of cause of action; and (3) there is an identity of parties or their privies." *River Park, Inc. v. City of Highland Park,* 703 N.E.2d 883, 889 (Ill. 1998).

*Res judicata* does not bar the Casinos' claims here because the second element is not met: this action does not present the same claim under the transactional test Illinois adopted in *River Park, id.* at 893. In the first state action, the Casinos asked the court "to determine the constitutionality of [the '06 Act]," and the Illinois Supreme Court held that "[the '06 Act]

withst[ood] the constitutional challenges raised" under the state and federal constitutions. *Empress I*, 896 N.E.2d at 282. In the second state action, the Casinos "challeng[ed] the constitutionality of [the '08 Act]," and the Illinois courts upheld the new law. *Empress II*, 942 N.E.2d at 786, 789. Indeed, this is not the first time we have been asked to consider the *res judicata* effects of the earlier litigation. We concluded before that "the claims … in the two [state] suits are materially different" than those involved here, see *Empress III*, 638 F.3d at 537, and we adhere to that assessment. (This conclusion makes it unnecessary for us to decide whether the cases involve the same parties.) The two state actions were facial challenges to the validity of the Racing Acts. Neither state action considered the question at issue here: whether the Racetracks are liable to the Casinos for bribing the governor to sign the '06 and '08 Acts.

## III

The circumstances surrounding the enactment of the two Acts differ significantly, and so we analyze them separately. We conclude that the Casinos failed to present sufficient evidence with respect to their allegations about the '06 Act. The '08 Act is another matter. For it, the Casinos presented sufficient evidence on proximate cause to withstand summary judgment. As we noted earlier, we naturally are not vouching for any of the facts on which we rely here; instead, as required, we are reviewing the district court's grant of summary judgment *de novo* and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *Shaffer v. Amer. Med. Ass'n*, 662 F.3d 439, 442 (7th Cir. 2011).

*The '06 Act.*—We begin with the allegation that the Race-tracks bribed Governor Blagojevich to push the '06 Act through the state legislature. Even if a RICO suit could be based on such an allegation (a questionable proposition), the Casinos have not presented sufficient evidence to permit a trier of fact to find that Governor Blagojevich caused the legislature to pass the '06 Act.

RICO's private civil remedy provision states:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor … and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee … .

18 U.S.C. § 1964(c). Prohibited activities under RICO include the "conduct of [an] enterprise's affairs through a pattern of racketeering activity," 18 U.S.C. § 1962(c), as well as a conspiracy to do the same, *id.* § 1962(d). To state a claim under this provision, the plaintiff must allege that "an injury to [his] business or property result[ed] from the underlying acts of racketeering." *Haroco, Inc. v. Amer. Nat'l B&T Co. of Chi.*, 747 F.2d 384, 398 (7th Cir. 1984). Under RICO, the plaintiff "can only recover to the extent that [] he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Bribery of government officials is one offense that can serve as a predicate for a RICO violation. 18 U.S.C. § 1961(1); see also *Salinas v. United States*, 522 U.S. 52, 62–66 (1997).

RICO borrows the doctrine of proximate cause from anti-trust law. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267–68

(1992). In both the antitrust and RICO contexts, "the focus is on the directness of the relationship between the [defendant's alleged] conduct and the harm." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 12 (2010); see also *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("[T]he central question [to] ask is whether the alleged violation led directly to the plaintiff's injuries."); *Holmes*, 503 U.S. at 268 (RICO requires "some direct relation between the injury asserted and the injurious conduct alleged"). As the Supreme Court has explained:

> '[P]roximate cause' [serves] to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts, with a particular emphasis on the demand for some direct relation between the injury asserted and the injurious conduct alleged. The direct-relation requirement avoids the difficulties associated with attempting to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors … .

*Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 654 (2008).

The Casinos have not pointed to evidence that would allow a factfinder to conclude that the Racetracks' alleged bribery scheme caused the legislature to pass the '06 Act. To begin with, the Casinos make no allegation and have no evidence that the Racetracks ever bribed or attempted to bribe state legislators. Nor do the Casinos point to evidence that the governor agreed to exert improper influence over state legislators in order to win their support of the '06 Act in exchange for a bribe. See *McCutcheon v. Fed. Election Comm'n*,

134 S. Ct. 1434, 1450 (2014) ("[W]hile preventing corruption or its appearance is a legitimate objective, Congress may target only a specific type of corruption—'*quid pro quo*' corruption."). In fact, every legislator who was deposed testified that the governor had not attempted to induce his vote on the '06 Act.

A careful look at the record also reveals that the Casinos' suggestion that the governor threatened to withhold funding to various legislators' districts is unsubstantiated, but to the extent this was more simple logrolling, it falls short of evidence that could support a RICO claim. The Casinos refer us to several exhibits that purportedly show that "Blagojevich or his staff link[ed] changed votes on the ['06] Act to capital expenditures like highway spending in the representatives' districts." But this is an exaggeration of the record. Representative Phelps, for example, when asked whether it was possible that Governor Blagojevich had called him to discuss the 3% fee, claimed not to remember. At the same time, when asked if it was possible that the topic came up and he just did not recall, he answered "no" and said that he would have remembered something like that. Representative D'Amico flatly denied that the governor raised the issue of the 3% fee in a phone call about a different bill. Representative Giles's testimony was the same. Other exhibits referenced by the Casinos contain nothing but inadmissible hearsay on the point. See Ex. 85 (declaration of Maddox); Ex. 86 (email from Maddox) ("Brandon Phelps said …"); Ex. 87 (email from Satz based on reports he heard); Ex. 88 (emails from James Morphew) ("Hassert told me this morning … "). Finally, an admissible email from one of the defendants says nothing about the governor's linkage of the '06 Act to highway spending or any other improper exertion of influence.

See Ex. 89 (email from Tim Carey, president of Hawthorne Race Course) ("[T]he fact that the Gov was working the phones for us was a great sign that this could make it to his desk.").

The fact that the bill failed to garner a majority on the first few votes does not suffice to raise a genuine issue of material fact. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986). Numerous reasons, including the change to the bill restricting its application to the highest-earning casinos or just the usual give-and-take of legislative lawmaking, might explain the change in outcome.

The Casinos also point to statements on the floor of the General Assembly and in various media reports, but these statements are not admissible to prove the matters asserted therein. See FED. R. EVID. 801(c), 802. Even if they were admissible, they show very little; the fact that the governor met with unnamed legislators during the months-long period when the bill was under consideration does not show anything untoward. We do not know which legislators met with the governor, nor what was discussed. The worst comment the Casinos identify is Rep. Hassert's obviously inadmissible statement that it was his "understanding … [that] promises [were] made to support this bill." Not only is that comment an out-of-court statement offered to prove the truth of the matter asserted; the underlying sentiment is not based on personal knowledge. See FED. R. EVID. 805. Worse, we have no idea what promises he was talking about. If the promise referred to support for re-election, or a commitment to co-sponsor a bill, without any taint of bribery, nothing would be wrong.

We accept for present purposes that, in an appropriate case, a "finding that bribery of a [government official] proximately caused a plaintiff's injury can [] rest on evidence of that individual's influence over the proceedings." *Bieter Co. v. Blomquist*, 987 F.2d 1319, 1327 (8th Cir. 1993). But that principle does not apply to the '06 Act. The record contains no admissible evidence that Governor Blagojevich unduly pressured members of the legislature to support the '06 Act. Nor is there competent evidence that would permit an inference that any identifiable group of legislators "voted as a bloc" at the governor's behest. No legislator was bribed. It takes more than the Casinos have shown here to support their proposed conclusion that the workings of an entire state legislature were coopted by the bribery of one official.

The work of state legislatures lies at the heart of the "Republican Form of Government" that the Constitution mandates. U.S. CONST. art. IV, § 4; see also THE FEDERALIST No. 51 (James Madison) ("In republican government, the legislative authority necessarily predominates."). The evidence would have to be extraordinary to conclude that one corrupt official, whether the governor or anyone else, had hijacked this foundational institution of state sovereignty. And even if the evidence were strong, the cure may not lie in civil litigation in the courts. See *Fletcher v. Peck*, 10 U.S. 87, 131 (1810) ("[A] court, sitting as a court of law, cannot sustain a suit brought by one individual against another founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law."). We do not need to explore the outer boundaries of the *Fletcher* holding here, because this record is devoid of admissible evidence that the governor exerted undue influence on legislators as they considered the '06

Act. The Casinos' case must fail insofar as it rests on that episode.

Evidence is similarly lacking to support a finding that the Racetracks bribed Governor Blagojevich to sign the '06 Act into law. The Casinos point to a meeting between Johnston and Blagojevich's aide Chris Kelly in 2006 while the Act was stalled in the legislature. But they provide no evidence that Johnston offered Kelly a bribe in exchange for Governor Blagojevich's signature during that meeting. The letter from the Racetracks to Blagojevich after the '06 Act passed merely thanked him for his support; it did not suggest that Blagojevich had agreed to sign the bill in exchange for a bribe. The fact that the Racetracks later made campaign contributions cannot, without more, support liability for acts of political corruption. To hold illegal an official's support of legislation furthering the interests of some constituents shortly before or after campaign contributions are solicited and received "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation." See *McCormick v. United States*, 500 U.S. 257, 272 (1991).

Because the evidence the Casinos presented in opposition to summary judgment with respect to the '06 Act would not permit a trier of fact to rule in their favor, the district court properly granted summary judgment for the Racetracks on these claims.

*The '08 Act.*—The circumstances surrounding the '08 Act are another matter. As with the '06 Act, the record contains little evidence to show that the Governor's influence caused

the legislature to pass the '08 Act. But that is not all that the Casinos alleged. They also asserted that the Racetracks and the governor agreed to a *quid pro quo*: in exchange for the governor's signature on the '08 Act, the Racetracks promised to give $100,000 to his campaign fund.

The summary judgment record contains considerable evidence that, if credited, would support the allegation of a *quid pro quo* between the Racetracks and Governor Blagojevich. When Blagojevich did not immediately sign the '08 Act into law, Racetracks executive Johnston stated to a colleague in an email: "We are going to have to put a stronger bit in his mouth!?!" Johnston complained to Blagojevich's chief of staff Monk that the delays in signing the bill were costing Johnston $9,000 per day. A factfinder could conclude that Blagojevich was talking about Johnston's commitment to pay $100,000 when he informed Monk that he would "like some separation between that and signing the bill." After the FBI recorded Monk and Blagojevich scheming about getting Johnston to pay, Monk met with Johnston and, according to Monk, delivered the message that the bill would not be signed until he paid. According to Monk, Johnston countered with an offer to pay half the money at once and half later. Monk called Blagojevich immediately after the meeting with Johnston to report his belief that Johnston would soon pay. After learning of the criminal allegation that Blagojevich threatened not to sign the '08 Act bill unless he was paid $100,000 by someone in the horseracing industry, Johnston admitted, "I didn't know if anybody else had given 100,000, but I knew I did." Finally, Johnston signed an immunity agreement in which he acknowledged that he had information that "may tend to incriminate" him. From this and other evidence in the record, a reasonable juror could con-

clude that the Racetracks agreed to pay $100,000 to Blago-
jevich's campaign fund in return for his signature on the '08
Act.

Blagojevich's signature on the bill caused the '08 Act to
become law. Under Illinois law, bills passed by the General
Assembly must be presented to the governor within 30 days.
ILL. CONST., art. IV, § 9(a). "If the Governor approves the bill,
he shall sign it and it shall become law." *Id.* "If the Governor
does not approve the bill, he shall veto it by returning it with
his objections to the house in which it originated." *Id.* § 9(b).
If the factfinder believes the evidence supporting the Casi-
nos' allegations, it could conclude that the bill was presented
to the governor and he signed it in exchange for a lucrative
campaign contribution. Unlike the allegation that the Race-
tracks bribed the governor to persuade the 150-member leg-
islature to enact the bill, the '08 Act became law as a direct
result of the alleged agreement to trade money for one per-
son's action—the governor's signature. A jury could find that
the causal chain between the Racetracks' bribe and the gov-
ernor's signing of the bill was not broken by any intervening
acts of third parties. *Cf. Hemi Group*, 559 U.S. at 11 ("[T]he
City's harm was directly caused by the customers, not
Hemi."); *id.* at 25 (Breyer, J., dissenting) (taking issue with
the majority's suggestion that "the intervening voluntary
acts of third parties … cut[] the causal chain"). Only the gov-
ernor had authority to sign the bill into law, and he did so.

It does not matter that the '08 Act passed the legislature
by veto-proof majorities. See ILL. CONST., art. IV, § 9(c). It
cannot be assumed that a veto-proof majority will hold in
the face of an executive veto. See, *e.g.*, McGrath, Rogowski, &
Ryan, *Gubernatorial Veto Powers and the Size of Legislative Coa-*

*litions* (Dec. 11, 2013) (S. Pol. Sci. Ass'n), https://pages.wustl.edu/files/pages/imce/rogowski/mrr-coalitions-nov13.pdf (demonstrating how the threat of a veto affects legislative coalitions and influences policymaking); Steven Dennis & Emma Dumain, ROLL CALL, "The 39 House Democrats Who Defied Obama's Veto Threat," (Nov. 15, 2013), http://blogs.rollcall.com/218/the-39-house-democrats-who-defied-obamas-veto-threat/ (last visited August 15, 2014). Many legislators, especially those in the governor's party, may hesitate to override a veto even if they originally voted for the bill. That the '08 Act cleared the General Assembly by a veto-proof majority does not erase the significance of the governor's signature. If it did, it would be unnecessary to obtain the governor's signature on a bill that passed by veto-proof majorities.

Nor does it matter that the bill would have become law even if Governor Blagojevich had neither signed nor vetoed it. See ILL. CONST., art. IV, § 9(b) ("Any bill not so returned by the Governor within 60 calendar days after it is presented to him shall become law."). RICO claims sound in tort. See *Beck v. Prupis*, 529 U.S. 494, 501–06 (2000) (discussing historical relationship between tort and RICO claims and explaining that "Congress meant to incorporate common-law principles when it adopted RICO"); *Anza*, 547 U.S. at 466–67 (Thomas, J., concurring in part and dissenting in part) (applying causation and damages principles from RESTATEMENT (SECOND) OF TORTS (1977) to analysis of RICO claims). The alleged bribery here was an intentional tort. Like an arsonist who burns down a cabin the day before a natural forest fire, the Racetracks may be "jointly and severally liable for any indivisible injury legally caused by [their] tortious conduct," re-

gardless of innocent alternative causes. See RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT LIABILITY § 12 (2000).

That brings us to the heart of the matter: Was the Racetracks' alleged agreement to bribe the governor to sign the '08 Act sufficiently immediate to serve as a legal cause of the Casinos' injuries for purposes of RICO? The focus of the inquiry is the directness of the injury resulting from the defendants' conduct. The Supreme Court has spoken to RICO's proximate-cause requirement on several occasions, and so we begin with a look at its guidance.

In *Anza*, the plaintiff alleged that the defendant, its business competitor, defrauded the State of New York by failing to charge certain sales taxes. 547 U.S. at 454–55. As a result, the defendant was able to offer lower prices than the plaintiff; those prices had the foreseeable effect of hurting the plaintiff's business. The Court held, however, that the "direct victim of [the defendant's] conduct [was] the State of New York," not the plaintiff. *Id.* at 458. The cause of plaintiff's harm was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* The plaintiff's theory in *Anza* failed because it required a multi-step analysis: from the defendants' underpayment of taxes, to their reduced prices, to the plaintiff's loss of sales. The defendants' misconduct—underpayment of taxes—did not by itself harm the plaintiffs. That fact, in light of "the general tendency of the law, in regard to damages …, not to go beyond the first step," *Hemi Grp.*, 559 U.S. at 10, quoting *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918) (Holmes, J.), doomed the plaintiff's case. The case before us, by contrast, exemplifies direct effect. The object of the conspiracy was to bring the '08 Act into effect in ex-

change for a cash bribe; the Act harmed the Casinos to the tune of 3% of their revenue. The Casinos thus sat in the center of the target of the conspiracy.

*Hemi Group* offers another example of an effect that is too indirect. There, the plaintiff City alleged that the defendant fraudulently avoided filing certain tax reports with the State regarding cigarette sales. 559 U.S. at 4. The City used the reports to assess back sales taxes against cigarette buyers, and so the defendant's fraud against the State ultimately allowed some buyers to avoid paying taxes they owed the City. "[T]he conduct directly responsible for the City's harm was the customer's failure to pay their taxes," not the defendant's failure to file reports. *Id.* at 11. Thus, as in *Anza*, "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud." *Id.* Both *Anza* and *Hemi Group* stand for the same general proposition: only persons injured directly by the defendant's misconduct may recover under RICO.

Until the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), parties usually discussed this kind of limitation under the rubric of statutory standing. In *Lexmark*, however, the Supreme Court disapproved of the idea of "prudential" standing. Properly understood, the Court said, whether a plaintiff may sue "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." 134 S. Ct. at 1387. The Court had already held in *Holmes* that Congress did not mean "to allow all factually injured plaintiffs to recover" under RICO. 503 U.S. at 266. But in *Bridge*, the Court was equally clear that

extra-statutory restrictions on the right to sue have no place. 553 U.S. at 648. It therefore rejected a rule of first-party reliance that could be found nowhere in the statute.

We see nothing in RICO, as the Supreme Court has interpreted it, that would bar the Casinos from pursuing their claim with respect to the '08 Act. There was no more directly injured party standing between the Casinos and the alleged wrongdoer, and thus no one else to whom they could look for relief; their injuries were not derivative. The money they paid pursuant to the '08 Act did not compensate the State of Illinois for any losses to the state. Rather, the Casinos themselves suffered the only injury resulting from the Racetracks' alleged conspiracy to enact the '08 statute.

The Casinos do not occupy the role of disgruntled taxpayer here. That, too, would pose a problem for them, as *Ill. ex rel. Ryan v. Brown*, 227 F.3d 1042 (7th Cir. 2000), demonstrates. There we rejected the plaintiffs' allegation that the defendant bribed the state treasurer in exchange for large deposits of state money. Plaintiffs, acting only in their capacity as ordinary Illinois taxpayers, sued to recover the state's losses. But they had "suffered only in the general way that all taxpayers suffer when the state is victimized by dishonesty." *Id.* at 1045. Only "the State of Illinois itself was directly injured by the misdirection of its funds into … the pockets of miscreants." *Id.* Therefore, we held, the "State [was] the proper party to be suing, not the plaintiffs." *Id.* at 1046.

Here, the general limitation on taxpayer standing found in Article III does not apply. The Casinos do not "challenge laws of general application where their own injur[ies] [are] not distinct from that suffered in general by other taxpayers or citizens." See *Hein v. Freedom from Religion Found., Inc.*, 551

U.S. 587, 598 (2007), quoting *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 613 (1989) (Kennedy, J.). The '08 Act taxed only five entities in the entire state. Other taxpayers and citizens were unaffected. Moreover, the Casinos are not challenging the tax itself in this litigation, having lost earlier efforts pursuing that theory. Rather, they seek damages from a private party for an alleged conspiracy to use the power of state government to take money from them. Their injury is easily measured, and it is directly traceable to the Racetracks' alleged conduct (bribing the governor to sign the '08 Act) and remediable by this court. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). They thus face no standing barrier to their lawsuit under Article III.

In closing, we stress that the only RICO element we are deciding is the issue of proximate cause. To sustain their section 1962(d) conspiracy claim, the Casinos must ultimately show "that (1) the defendant[s] agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant[s] further agreed that someone would commit at least two predicate acts to accomplish these goals." *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (internal quotation marks omitted); see also *Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Ill.*, 424 F.3d 659, 674 (7th Cir. 2005); *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 964 (7th Cir. 2000). We recognize that our rejection of the Casinos' claims based on the '06 Act may have an impact on their ability to show that the defendants agreed to the commission of two predicate acts, see *Brouwer*, 199 F.3d at 964, or that the defendants "knowingly agreed to perform services of a kind [to] facilitate the activities of those … operating the enterprise in an illegal manner," *id.* at 967. We are

reluctant to delve into those issues without a proper adversary presentation. Instead, because the evaluation of the case as a whole may be affected by our decision on proximate cause, we confirm that the district court is free on remand to revisit its decisions on the other RICO elements should the parties choose to revisit them in light of this opinion.

## IV

If the Casinos are correct, the Racetracks agreed to pay Governor Blagojevich $100,000 in exchange for his signature on the '08 Act. The direct and immediate consequence of that illegal agreement was to deprive the Casinos of 3% of their annual revenue. There is "a direct relation between the injury asserted and the injurious conduct alleged." See *Bridge*, 553 U.S. at 654–55. Accordingly, we REVERSE the district court's grant of summary judgment insofar as it relates to the signing of the '08 Act and REMAND for further proceedings consistent with this opinion.